**AMERICAN TELEPHONE AND TELEGRAPH COMPANY,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 93–483 C.

United States Court of Federal Claims.

Feb. 7, 1995.

C. Stanley Dees, J. Keith Burt, Andrew Saunders, McKenna & Cuneo, Washington, DC, Loretta A. Cecil, and Robert H. Camp, Greensboro, NC, for plaintiff.

Brad Fagg, with whom were Asst. Atty. Gen. Frank W. Hunger, Director David M. Cohen, Dept. of Justice, Washington, DC, B.J. Plunkett, III, and Stephanie L. Buser, Dept. of the Navy, for defendant.

## OPINION

WIESE, Judge.

On December 31, 1987, the Department of the Navy awarded plaintiff, American Telephone & Telegraph Company (AT & T), a fixed-price incentive fee contract involving research, development and production of a ship-towed, undersea surveillance system referred to as the reduced diameter array (RDA). In the successful performance of this contract, AT & T claims to have incurred contract costs approaching 101 million dollars—an amount far in excess of the contract's adjusted ceiling price of 34.5 million dollars. A claim for the recovery of these added contract expenditures was submitted to the contracting officer by AT & T on December 18, 1992. The claim was denied; the matter is now before this court for resolution.

The core proposition advanced by AT & T is that the Navy was prohibited by statute and regulation from contracting, on a fixed-price basis, for the procurement of research and development effort of the sort required under the RDA contract. A contract executed in violation of these prohibitions, plaintiff maintains, may be reformed by the court so as to conform with procurement policy directives—directives which, according to plaintiff, counsel the use of cost reimbursement contracts for research and development effort. Alternatively, should the court deem contract reformation an inappropriate remedy, plaintiff asks that its contract be declared a nullity and that it be compensated on a *quantum meruit* basis for the value of the

benefit conferred upon the Government under the voided contract. Defendant disagrees with these arguments claiming that the contract in issue represents a valid exercise of procurement authority. Additionally, defendant contends that plaintiff's claim, no matter its ultimate merit, is not ripe for judicial consideration because it was prematurely addressed by the contracting officer.

The arguments in support of these respective positions are offered here, first, through defendant's motion to dismiss for lack of jurisdiction or, alternatively, motion for summary judgment; secondly, through plaintiff's cross-motion for partial summary judgment. Having considered the parties' written submissions together with the points raised during oral argument, the court denies defendant's motion to dismiss and also the parties' motions for summary judgment.

## FACTS

### The RDA Contract

One of the means by which the United States Navy carries out the detection, classification, and bearing estimation of submarines is through an integrated undersea surveillance system known as SURTASS. SURTASS (which stands for surveillance towed-array sensor system) is a mobile, passive, acoustic surveillance sonar system comprised of integrated electronic and hardware arrays that operate in conjunction with ship and shore-based support facilities. Among these arrays is the subject of plaintiff's research and development contract—the SURTASS Reduced Diameter Array Subsystem. The RDA subsystem comprises the sonar segment of SURTASS; it includes shipboard and shore-based electronics, ship/winch interface, array tow cable, and the array itself—a long slender flexible hose, approximately 8,000 feet in length, containing hydrophones and other sensors and electronics. This array is towed from a surface vessel referred to as the T–AGOS SURTASS ship.

In addition to designing of the RDA subsystem, the RDA contract provided for delivery and testing of an engineering development model. The contract also contained an option for a second engineering development model and an option to purchase three pro-duction-level RDA subsystems. Both options have been exercised by the Navy.

Design of the RDA subsystem has been completed, demonstrated and approved by the Navy. The first engineering development model has been delivered, as have substantial portions of the second engineering model, and delivery of the first production-level RDA subsystem is imminent. The equipment AT & T has delivered under the RDA contract is currently in use by the Navy.

### Funding of the RDA Contract

The RDA contract was structured as a multi-year, incrementally-funded undertaking. At the time of award, funds for the start-up of the research and development effort were made available through an obligation of funds that drew upon appropriations authorized by the Department of Defense Appropriations Act, 1988. Pub.L. No. 100–202, 101 Stat. 1329 (1987).

Included in the text of that statute was a provision, section 8118, pertaining to the use of appropriated funds for fixed-price contracts exceeding $10,000,000 that involved development of a major system or subsystem. Section 8118 read in full as follows:

> None of the funds provided for the Department of Defense in this Act may be obligated or expended for fixed price-type contracts in excess of $10,000,000 for the development of a major system or subsystem unless the Under Secretary of Defense for Acquisition determines, in writing, that program risk has been reduced to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between the contracting parties: *Provided,* That the Under Secretary may not delegate this authority to any persons who hold a position in the Office of the Secretary of Defense below the level of Assistant Secretary of Defense: *Provided further,* That the Under Secretary report to the Committees on Appropriations of the Senate and House of Representatives in writing, on a quarterly basis, the contracts

which have obligated funds under such a fixed price-type developmental contract.

101 Stat. at 1329–84.

Provisions essentially identical to section 8118 have been included in all Department of Defense appropriation statutes enacted since 1987.

Neither at the time of award of the RDA contract nor during the subsequent years when contract performance was on-going were any of the funds which the Navy expended for that contract effort made the subject of a section 8118 determination by the Under Secretary of Defense for Acquisition or his delegate.

*AT&T's Claim*

From an engineering and technical standpoint, AT&T's contract effort has been successful; from a financial standpoint it has not. Through the end of 1990 (approximately the mid-point of the contract period), AT&T experienced $24 million in losses on the contract and more were expected to follow.

In order to gain some relief from this situation and to help bring costs under control, AT&T contacted the Navy in 1991 asking the procuring activity (the Space and Naval Warfare Systems Command), not to exercise its production system options under the contract. AT&T's formal request for this relief was set forth in a letter to the Navy of August 21, 1991. The letter called attention to "statutory restraints on the use of R & D [research and development] funds for fixed price contracts" existing at time of contract award and to Department of Defense procurement policy (expressed in an April 15, 1991 memorandum by the Acting Under Secretary of Defense for Acquisition) cautioning against the use of "fixed- or ceiling-priced production options obtained before the start of full-scale development contracts."

The request for relief was not heeded. The Navy exercised the production option for three RDA subsystems on September 26, 1991, thus prompting AT&T to continue its search for financial relief. Accordingly, on August 31, 1992, AT&T met with a Navy contracting officer to seek an equitable adjustment under the contract. Again, however, relief was not forthcoming.

During this meeting, AT&T reasserted the position it had previously expressed to the Navy, namely, that the RDA contract violated statutory constraints governing the use of fixed-priced research and development contracts. This position was reemphasized in a follow-up letter that AT&T forwarded to the contracting officer on September 16, 1992. Therein AT&T wrote:

[I]t is clear that the RDA Contract was awarded in violation of the law. Since the RDA agreement was a development contract in excess of $10 million that was funded with fiscal year 1988 funds, it was subject to Section 8118 of the 1988 Department of Defense Appropriations Act. In spite of this coverage, the Navy did not comply with that Section in awarding the contract by admittedly failing to obtain the requisite statutory certification before its execution. Therefore, whether the RDA Contract is viewed as a product of mutual mistake, or illegal for violating Section 8118, AT&T is entitled to have the contract repriced and restructured. The law requires such remedial consideration through reformation of the existing agreement ... or through recovery without regard to the original contract under the *doctrine of quantum meruit.*

The letter concluded by saying that "AT&T will submit a claim under the Contract Disputes Act for restructure and repricing of the RDA Contract as relief justified for the reasons set forth above."

On December 18, 1992, AT&T submitted a certified claim to the contracting officer asserting that the RDA contract was awarded in violation of Section 8118 and seeking to recover its then current losses, together with related fee, of $59,937,000. The claim "conclusion" read as follows:

The RDA Contract should be reformed to comply with section 8118. Consistent with section 8118, the RDA Contract should be reformed to a cost-type contract providing for an estimated cost of $100,574,000 and a fixed fee of $13,502,000. Pursuant to reformation of the RDA Contract to a cost-type contract, AT&T is entitled to payment of $49,843,000 for the unpaid costs it has incurred in performing the Contract plus

$10,094,000 in fee. If the RDA Contract is not reformed to comply with section 8118, the Contract is void *ab initio* and AT&T is entitled to recover under *quantum meruit* the fair market value of the benefit it has conferred on the Navy to date. As of the end of October 1992, the amount of AT&T's recovery under *quantum meruit* is $59,937,000, which represents all of the unpaid costs it has incurred in performing the RDA Contract plus a reasonable profit. Since AT&T is continuing to perform at the government's direction, this amount will increase.

As happened twice before, AT&T's request for relief was not successful. In a final decision dated June 18, 1993, the contracting officer rejected AT&T's contention that the RDA contract was awarded in violation of the requirements of section 8118. Also rejected was the assertion that enforcement of the contract contravened DOD procurement policies that counseled against the use of fixed-price contracts for developmental efforts except where the appropriateness of such contracts was supported by highly credible cost and pricing data.

On August 3, 1993, AT&T filed its complaint in this court seeking to recover $59,-937,000, plus any additional costs and fee incurred in performing the RDA effort prior to judgment. The complaint alleges two counts. Count I asserts that the Navy awarded the RDA contract in violation of section 8118 and, in subsequent years, continued to obligate funds to the contract in violation of the successor provisions to section 8118. Count I also alleges that the RDA contract was awarded in violation of the Federal Acquisition Regulations and Department of Defense Directive 5000.1. As a result of these violations of law and regulation, AT&T seeks in Count I to have the RDA contract reformed to a cost-reimbursement contract or to recover the value of the benefit it conferred on the Navy under the doctrine of *quantum meruit*. In Count II, AT&T contends that the RDA contract was awarded as a fixed-price development contract in violation of law and regulation as a result of the parties' mutual mistake of fact. AT&T seeks

to have the contract reformed to a cost-type contract to correct the parties' mistake. At present, AT & T brings before the court for consideration only that part of Count I which challenges the legality of the RDA contract on grounds of non-compliance with section 8118.

## DISCUSSION
### Defendant's Motion to Dismiss

Defendant contends that this case must be dismissed for lack of jurisdiction. There are two branches to the argument. The first, which we take up immediately below, goes to the question whether the court has before it a "claim" within the meaning of the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1988 & Supp. V 1993); the second has to do with AT&T's request for relief on a *quantum meruit* basis. The latter part we leave to the discussion on the merits.

We begin then with the argument centered on the Contract Disputes Act. Defendant maintains that the demand presented by AT&T fails to satisfy judicially-defined standards for the existence of a claim under the Contract Disputes Act and therefore cannot be heard by this court. According to defendant, the requisites of a claim—as defined either for purposes of this court's jurisdiction or for purposes of a contracting officer's final decision authority—demand, first of all, the existence of a dispute between the contracting parties. That is to say, the subject of the contractor's request for relief—the contract entitlement that is being claimed—must have evolved to the point of impasse between the parties. Absent the existence of a dispute, a contractor's written submission of a demand for relief cannot be considered the submission of a claim.

Additionally, defendant maintains that where the relief that is sought is the payment of money (the case here), the dispute between the parties must extend to and include a sum certain. Thus, allegations of entitlement, unaccompanied by the demand for a specific sum, are, in defendant's view, insufficient to establish a claim for money.

It is upon this last-stated proposition—the alleged necessity for a dispute centered on a sum certain—that defendant bases its motion to dismiss. Defendant points out that AT&T

did not state the amount of its claim with any specificity until the submission of its certified claim on December 18, 1992. Up to that point, the dialogue that had taken place between the parties was confined to AT&T's theories of recovery as opposed to the amount of that recovery. Consequently, the dispute that emerged never focused on a specific sum. And that limitation, defendant now maintains, rendered the contractor's written submission of December 18, 1992 inadequate for purposes of obtaining a contracting officer's final decision on a money claim. In substantiation of this argument, defendant refers the court to a number of Federal Circuit decisions, chief among these being the decision in *Dawco Construction, Inc. v. United States*, 930 F.2d 872 (Fed.Cir. 1991).

█ That case, in our view, does not stand for the proposition for which it is now being cited. Granted, the court there did say that "a claim must seek payment of a sum certain as to which a dispute exists at the time of submission." 930 F.2d at 878. These words, however, may not be read in isolation. Rather, they are to be understood in the context of the problem that occasioned them. Specifically, the contractor there had requested a contracting officer's final decision on a proposal for an equitable adjustment (addressing Government-acknowledged changes) that set forth costs that were incomplete and that had not been previously discussed between the parties. It was in that specific setting that the court declared that a "claim" demands a request for payment that is in dispute. But, in so speaking, all the court was doing was noting the obvious: that it made no sense to label an asserted entitlement a claim when the party against whom the demand was being made had had no meaningful opportunity to evaluate its merits. A claim, in other words, does not arise until it is known whether the entitlement that is asserted will, in fact, be contested.

█ Moreover, that contest does not have to reach the specific amount in issue in order to transform a disagreement into a claim. A disagreement on the threshold issue of liability is as much a claim for purposes of the CDA as a disagreement on the amount of entitlement. This point is made clear by the text of the governing regulation, 48 C.F.R. § 33.201 (1994):

> *Claim*, as used in this subpart, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.... A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), *if it is disputed either as to liability or amount* or is not acted upon in a reasonable time. (second emphasis added).

Given this regulation, there is no room for the argument that a demand for monetary relief under a contract cannot be considered a claim for purposes of the Contract Disputes Act unless and until both liability and amount have been put into issue. The regulation plainly recognizes that a written demand seeking payment of a sum certain becomes a claim "if it is disputed either as to liability or amount." Indeed, where liability is disputed, it necessarily follows that "amount" is also.

█ To sum up, given our reading of *Dawco* as well as the straightforward text of the procurement regulation, this court can find no basis upon which to sustain the Government's argument. Accordingly, we reject the contention that a demand for monetary relief cannot be elevated to a claim absent an antecedent dispute that specifically took into consideration the amount of that demand. The court therefore holds that AT&T's submission of December 18, 1992 constituted a claim for purposes of the Contract Disputes Act. Thus, we have jurisdiction over this matter.

*The Motions for Summary Judgment*

As earlier noted, AT & T is asking for reformation of its contract to a cost-reimbursement, incentive-fee contract or, in the alternative, for a declaration holding the contract void with payment for benefits conferred to be allowed on a *quantum meruit*

basis. The premise for each of these demands is AT&T's contention that award of the RDA contract should have proceeded in accordance with the requirements of section 8118. That it did not so proceed, plaintiff contends, renders the contract illegal and thus subject either to reformation or annulment.

These arguments are met by the defendant with a number of contentions starting with the proposition that plaintiff lacks standing to contest the Government's administration of section 8118. That statute, defendant maintains, was enacted for the Government's own benefit and protection and not for the benefit of defense contractors. Consequently, whatever shortcomings might exist in regard to the Navy's implementation of section 8118, continues the argument, they abridge no enforceable rights of the plaintiff and thus offer no basis for suit in this court.

In deciding the merits of this argument we look to the words of section 8118. Among other things, the statute calls upon the Secretary of Defense to provide the congressional appropriations committees with quarterly reports identifying funding obligations committed to fixed-price type developmental efforts. Certainly, in this aspect, the statute is consistent with defendant's position that section 8118 was essentially a housekeeping provision focused on the Government's own needs. The aim of this reporting requirement was obviously to facilitate congressional oversight.

■ However, the focus of section 8118 is not restricted just to the reporting of fixed-price contracts for purpose of facilitating legislative budgetary controls. No less a concern of the statute—indeed, one could say, its principal concern—is to confine the use of fixed-price development contracts to situations where a determination has been made in writing "that program risk has been reduced to the extent that realistic pricing can occur." The purpose of this requirement, as the statute itself declares, is to insure "an equitable and sensible allocation of program risk between the contracting parties."

Quite plainly, then, the statute has more than the Government's own interests in mind. As plaintiff points out, use of the words "risk," "equitable," "sensible," "allocation," and "contracting parties" reflects a concern for sound contracting policies that encompasses the interests of both parties—contractors as well as the Government. Thus, by the plain words of the statute, the court is bound to conclude that section 8118's requirement for a written determination upholding the pricing integrity of a fixed-price development contract operates as a constraint on the contracting process intended for the protection of both Government and contractor. Accordingly, the failure to fulfill that requirement presents an issue of contract validity (a point we take up later) that either party has standing to raise.

Moving on, the Government next contends that even if plaintiff has standing to raise a section 8118 issue, no violation of law presents itself here because the RDA contract was not subject to the requirements of that section. Consideration of this argument takes us to the definition that was given by the Department of Defense to the phrase "major system" that appears in section 8118.

On February 11, 1988, two months after the enactment of section 8118, the Under Secretary of Defense for Acquisition issued a memorandum containing guidance for the implementation of that section. This memorandum instructed that, for purposes of section 8118, a major system was to be given the same definition as applied to that term in 10 U.S.C. § 2302(5). That section reads in relevant part as follows:

> The term "major system" means a combination of elements that will function together to produce the capabilities required to fulfill a mission need. The elements may include hardware, equipment, software or any combination thereof, but excludes construction or other improvements to real property. A system shall be considered a major system if (A) the Department of Defense is responsible for the system and the total expenditures for research, development, test, and evaluation for the system are estimated to be more that $75,000,000 (based on fiscal year 1980 constant dollars) or the eventual total expenditure for procurement of more than

$300,000,000 (based on fiscal year 1980 constant dollars) ...[.]

The directive set out in the Under Secretary's memorandum of February 11, 1988, was later incorporated into a formal instruction of the Secretary of the Navy, SECNAV Instruction 4210.6A, issued April 13, 1988. Thus, within roughly four months of the award of the RDA contract, the Navy had in place a guideline for application of section 8118 that defined a major system as one for which total expenditures, expressed in fiscal year 1980 dollars, were estimated to be more than 75 million dollars for research and development effort or more than 300 million dollars in production-item costs.

It is to this definition that defendant now points in support of its contention that section 8118 does not apply here. Starting with the proposition that the RDA contract involved the development of a system, as opposed to a subsystem, defendant goes on to point out that the contract contemplated a total expenditure for research and development effort of less than 75 million dollars; hence, it is argued that section 8118 has no application.

Plaintiff disagrees with these assertions. Plaintiff notes, first of all, that the RDA contract, as well as the Space and Naval Warfare Systems Command's published guide to the operational procedures of the SURTASS system, refer to the reduced diameter array as a subsystem rather than as a system. These descriptions, plaintiff further points out, are consistent with the definition of subsystem which was adopted by another military service branch, the Air Force, for purposes of implementing section 8118. That Service's published guidance for section 8118 describes subsystems as "the key elements of the major systems that function together to produce the system's capabilities required to fulfill a mission need." Thus, the reduced diameter array, plaintiff maintains, is properly classified as a major element of the Surveillance Towed–Array Sensor System (SURTASS); hence, a subsystem. In plaintiff's view then, since the RDA contract involved a subsystem rather than a major system, the definition defendant relies upon to avoid the application of section

8118 has, in fact, no bearing on the issue. Rather, what controls here is the $10,000,000 threshold spelled out in section 8118.

Taking the response a step further, plaintiff also contends that even if the reduced diameter array could be considered a major system rather than a subsystem, it would not escape the requirements of section 8118. To be more specific, plaintiff contends that the definition defendant relies upon—which puts the threshold for the application of section 8118 to research and development contracts at $75,000,000—is inconsistent with the corresponding figure set out in section 8118, namely $10,000,000. Thus, plaintiff argues that defendant's definition, being in conflict with the words of the statute, must be judged erroneous as a matter of law and thus of no force or effect.

■ In resolving this particular dispute, we put aside the question whether the reduced diameter array is more properly regarded as a subsystem than a system. It is enough for us to note that even if we accept defendant's contention that the reduced diameter array is a system in and of itself, rather than a subsystem of SURTASS, we cannot subscribe to the remainder of defendant's argument. Like plaintiff, this court too sees an unacceptable antagonism between the command of section 8118 and the attempted implementation of that command through the application of 10 U.S.C. § 2302(5).

Section 8118 says that appropriated funds may not be obligated or expended "for fixed price-type contracts in excess of $10,000,000 for the development of a major system" absent a written determination of pricing validity. Obviously, from Congress' point of view, major system expenditures begin at $10,000,000. Not so, however, under the definition of major system adopted by the Department of Defense. Going by that definition, a system is recognized as a major system only where Department of Defense expenditures "for research, development, test, and evaluation ... are estimated to be more than $75,000,000." 10 U.S.C. § 2302(5).

Clearly there is an incompatibility here. Adherence to the Department of Defense's

definition of major system results in excluding from the purview of section 8118 all expenditures for fixed-price research and development effort on major systems that fall below the $75,000,000 marker. Thus, the application of section 8118 is significantly narrowed. Defendant maintains, however, that since section 8118 itself provides no definition for the term "major system," the definition adopted by the agency charged with the administration of the statute is controlling. In support of this proposition, we are referred to the decision in *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

We reject defendant's argument. Granted, deference is owed to an agency's interpretation of a statute it is charged with administering. But deference, the Supreme Court has pointed out, "is not abdication, and it requires ... [courts] to accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 260, 111 S.Ct. 1227, 1236, 113 L.Ed.2d 274 (1991) (Scalia, J., concurring). First among these principles of construction is that the meaning of a statute is to be taken from the words it employs and where those words are clear and unambiguous, the task of statutory interpretation is at an end—the plain meaning of the words controls. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." (footnote omitted)).

In this case, Congress has enacted a statute directed to the prospective award of "fixed price-type contracts in excess of $10,-000,000 for the development of a major system or subsystem." The agency, in turn, has adopted as its guideline for the enforcement of this statute a definition that renders the statute inoperative with respect to those contracts which, while otherwise within the statute's reach, involve expenditures of less than $75,000,000. Such an administrative action cannot be upheld. It amounts not to interpretation of a statute but to the rewriting of a statute.

■ Nor can this interpretation be redeemed by contending, as defendant also does, that the incorporation of section 8118 into subsequent appropriation statutes, without any change in its text, is to be taken as a signal of Congress' approval of that interpretation. There are two answers to this contention. First, nothing in the record would permit us to say that Congress was ever made aware of the precise manner in which section 8118 was applied by the Department of Defense. True, the statute contained a requirement directing the Under Secretary of Defense to advise the congressional appropriations committees, on a quarterly basis, of all contracts for research and development awarded on a fixed-price basis. But all Congress reasonably could be expected to glean from such a reporting requirement is the dollar amount of fixed-price research and development contracts; not the statutory interpretation that governed the contract listing in the first instance.

■ Second, even if one could expect Congress to have become aware of the Department of Defense's definition for major system under section 8118, there is still no basis here for according that definition any legal effect. The rule that congressional reenactment of a statute may be taken as approval of the administrative construction applied to it cannot be invoked to engraft upon the statute a meaning hostile to its plain words. "When a regulation conflicts with the statute, the fact of subsequent re-enactment 'is immaterial, for Congress could not add to or expand [the] statute by impliedly approving the regulation.'" *Leary v. United States*, 395 U.S. 6, 25, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57 (1969) (footnote omitted) (quoting *Commissioner v. Acker*, 361 U.S. 87, 93, 80 S.Ct. 144, 148, 4 L.Ed.2d 127 (1959)). The action taken by the Department of Defense is contrary to the clearly expressed intent of Congress and is therefore contrary to law.[1]

---

1. As pointed out in the *Chevron* decision, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9.

But what is the consequence of this determination as far as the RDA contract is concerned? According to defendant, very little. Says defendant: "It is plain on the face of Section 8118 that a violation [of that section] represents an illegality not in the award of the RDA contract but merely in its *funding*." And in further explanation of this position, defendant adds: "[a]ll that was allegedly improper was the use of FY 1988 funding, which, if deemed inappropriate, could be remedied by a routine funding adjustment ... rather than by declaring the contract void or unenforceable." To round out the argument, defendant points out that "FY 1987 R & D funds were legally available for obligation at the time the contract was awarded."

The court cannot accept this reasoning. Under the terms of section 8118, appropriated funds could not be "obligated or expended" for fixed price research and development contracts involving major systems and subsystems absent a written determination supporting the credibility, from a research and engineering standpoint, of the parties' risk assessment and the resulting soundness of their contract pricing. Funds are considered obligated, that is, an amount is recorded as an obligation of the United States, upon the execution of a binding agreement between an agency and another person before the end of the period during which the appropriation remains available. 31 U.S.C. § 1501 (1988). Thus, the authority to obligate funds is synonymous with the authority to contract. It follows, therefore, that absent compliance with the written determination requirement of Section 8118, no authority to obligate funds came into being and thus no valid contract was created.

The constraint imposed on the expenditure of appropriated funds by section 8118, is indistinguishable, in principle, from a specific dollar limitation imposed by a statute authorizing expenditures for a particular project. In such cases too the failure to observe the conditions imposed on the obligation and expenditure of appropriated funds results in a contract void for lack of authority. *Curtis v. United States*, 2 Ct.Cl. 144, 151–52, 1801 WL 469 (1866). The impairment present here is not curable through a retroactive funding adjustment. Nor, for that matter, is it a defect that can be overcome by waiver or remedied by ratification. "[A] clear showing of illegality in an award precludes any contract from arising." *Alabama Rural Fire Ins. Co. v. United States*, 215 Ct.Cl. 442, 454, 572 F.2d 727, 733 (1978). In the eyes of the law, no formal contract was ever created.

We come, finally, to the basic assertions on which this suit is founded. Plaintiff maintains that the Navy's failure to adhere to the requirements of section 8118 in connection with the award of the RDA contract has resulted in the very harm the statute was intended to overcome, namely, the disproportionate allocation of pricing risk upon the contractor. Had the Under Secretary of Defense for Acquisition or his delegate complied with the statute, plaintiff maintains, the risks inherent in the work would have become apparent and a cost-type reimbursement contract with a fixed fee would have resulted. Therefore, to now achieve that result—to bring about what, according to plaintiff, should have been the case from the start—the court is asked to reform the RDA contract to a cost-type, fixed-fee arrangement and to redistribute the accumulated contract costs accordingly.

As an alternative to the request for contract reformation, plaintiff asks that the contract be declared a nullity and that, in its place, we recognize the existence of an implied-in-fact contract with compensation to be measured on a *quantum meruit* basis.

To speak first to reformation, this is a contract remedy which courts may grant in order to conform the parties' written agreement with their antecedent intent, that is, with the agreement that actually was reached. Thus, reformation, for the most part, is concerned with mistakes in expression, as in the case of the omission of an agreed-upon term, or the inclusion of a term not agreed upon or the incorrect reduction of a term to writing. E. Allan Farnsworth, Contracts § 7.5, at 468 (1982).

Reformation has also been invoked to rid a contract of a provision that contravenes existing law. See, for example, *Beta Systems,*

*Inc. v. United States,* 838 F.2d 1179, 1186 (Fed.Cir.1988) (recognizing reformation as appropriate means for correcting contract's incorporation of an economic price adjustment index not sanctioned by Government procurement regulations); *Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 183, 426 F.2d 314, 318 (1970) (granting reformation to allow upward adjustment in contract price to redress bid error whose correction, though authorized by regulation, the contracting officer had improperly refused), and *Nautilus Shipping Corp. v. United States,* 141 Ct.Cl. 391, 395, 158 F.Supp. 353, 355 (1958) (directing downward adjustment in agreed-upon purchase price of surplus vessel to conform to statutory pricing formula). The cited cases are among those upon which plaintiff relies for the proposition that where a contract is illegal it may be rewritten by the court so as to conform to what the parties would have negotiated had they complied with the law. It is this reasoning which leads plaintiff to the conclusion that the court may now reform the RDA to make of it a cost-reimbursement, fixed-fee undertaking.

 There is no authority in this court to bring about the result plaintiff seeks. With respect to a court's power to order reformation, there is a critical difference between an otherwise valid contract that contains a prohibited term or clause and a contract that is void from the inception. The former is amenable to reformation on the theory that the offensive provision is not significant enough to undermine the foundations of the contract; hence, to preserve the parties' contract, the court undertakes to correct what the parties could be expected to remedy on their own if the illegality were pointed out. Reformation of this limited character is simply an elaboration upon the parties' intent; *see,* as an example, *Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1186 (Fed.Cir.1988); it is akin to the power exercised by a court when supplying a missing term to an agreement otherwise sufficiently specific to be enforceable.

 But reformation of the sort plaintiff proposes is a much different matter. The RDA contract, being void from the inception, cannot be reformed. Said otherwise, there is

no power to remake that which was never established in the first instance. This same result obtained in *Hedges v. Dixon County,* 150 U.S. 182, 14 S.Ct. 71, 37 L.Ed. 1044 (1893). In that case, holders of bonds that a municipality had issued for amounts exceeding its borrowing authority, sought reformation of their instruments so as to conform them to the legal limits and thus to render the bonds enforceable to that extent. The Court held the invalidity of the bonds precluded their reformation:

> Where a contract is void at law for want of power to make it, a court of equity has no jurisdiction to enforce such contract, or, in the absence of fraud, accident, or mistake to so modify it as to make it legal and then enforce it.

150 U.S. at 192, 14 S.Ct. at 74. This too is a case where reformation cannot be had.

The last matter we address is plaintiff's demand that the RDA contract be declared a nullity, and that in its place, we recognize the existence of an implied-in-fact contract with compensation to be awarded on a *quantum meruit* basis. Defendant objects to this demand saying that relief granted for benefits conferred under a contract later declared void cannot be rationalized on an implied-in-fact contract basis. Rather, defendant contends, any relief the court may afford under such circumstances is, in reality, relief granted under a contract implied-in-law, *i.e.,* an unjust enrichment principle, and, as such, falls outside this court's authority under the Tucker Act, 28 U.S.C. § 1491 (1988 & Supp. V 1993). Therefore, defendant moves for dismissal of this branch of plaintiff's case for lack of jurisdiction.

Although this court recognizes the analytical force of defendant's argument, the issue is not one upon which discussion can profitably proceed. The question was squarely answered against defendant in *United States v. Amdahl Corp.,* 786 F.2d 387 (Fed.Cir. 1986). In that case, the court of appeals discussed, at length, the rule that where goods or services have been provided to the Government under a contract subsequently declared invalid, the contractor is entitled to recovery upon an implied contract for *quan-*

*tum meruit* or *quantum valebant.*[2] The court of appeals specifically referred to the implied contract as an implied-in-fact contract. Here is what the court wrote:

> [I]n many circumstances it would violate good conscience to impose upon the contractor *all* economic loss from having entered an illegal contract. Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated *under* the contract, but rather under an implied-in-fact contract.

786 F.2d at 393. In light of the foregoing, we deny defendant's motion to dismiss for lack of jurisdiction plaintiff's demand for relief measured on a *quantum meruit* basis.

The question remains, however, whether plaintiff is entitled to such relief. The rule requiring the Government to pay for the value of any tangible benefits received under a contract later deemed void is a restitutionary principle the object of which is to restore the parties to the position they held before the contract was awarded. To the extent altered circumstances preclude restitution in kind, for example, where services have been performed or goods delivered and sold, then an award of money becomes the substitute, the amount being determined on the basis of value to the recipient. The conceptual underpinning for a restitutionary measure of recovery is the avoidance of unjust enrichment. Dan B. Dobbs, Remedies § 4.1, at 224

(1973); Restatement (Second) of Contracts § 344 cmt. a (1979). As the decision in *Amdahl* put it: "it would violate good conscience to impose upon the contractor *all* economic loss from having entered an illegal contract." 786 F.2d at 393.

It is with the last-mentioned point—the recognition that restitution is aimed at avoiding *unjust* enrichment—that plaintiff's position encounters difficulties. In the name of *quantum meruit,* we are asked to reconstitute an invalid losing contract into an enforceable and profitable one. Indeed, what plaintiff seeks from this court is not the avoidance of *some* economic loss associated with its contract performance but, rather, the avoidance of *all* economic loss. Perhaps, in a proper case, such relief would be warranted, for as one commentator has observed, "[i]f there is any one rational principle that might be used to guide restitutionary measurements it is that the measure of restitution should reflect the substantive law purposes that call for restitution in the first place." Dan B. Dobbs, Remedies § 4.5, at 260 (1973).[3]

The question, however, is whether this is such a case; there is much that needs to be answered. The central concern, of course, is whether the relief being sought is warranted on the facts. Would the failure to grant relief to AT&T "unjustly" enrich the defendant? To answer that ultimate question, the court needs answers to the following preliminary questions:

1. At what point in the procurement history of the RDA contract did AT&T become aware of section 8118?

---

**2.** *Quantum meruit,* which translates "as much as he deserved," and *quantum valebant,* which translates "as much as they were worth," refer to the measures of recovery that are allowed a plaintiff for benefits provided a defendant under a contract lacking a price term or under circumstances where fairness demands that compensation be granted. Dan B. Dobbs, Remedies § 4.2, at 237–38 (1973). *Quantum meruit* applies where the benefits provided are in the form of services; *quantum valebant* where they are in the form of goods.

**3.** The court is aware that restitution is not an available remedy where completed performance

has occurred and nothing remains to be done save payment of the contract price. In that circumstance, recovery is limited to the price. See Restatement (Second) of Contracts § 373(2) and cmts. a, d (1979). However, we see this limitation as being applicable only to situations where restitution is being sought as an alternative to contract enforcement, *i.e.,* as a remedy for breach. Conceptually, the limitation should have no application in determining the measure of recovery appropriate to contracts void from their inception. In the latter situation, the objective is restoration of the parties to their pre-contract status.

**684**

2. What factors account for the cost overrun that AT&T experienced in its performance of the RDA contract?

3. To what extent would the factors identified in answer to question 2 have been amenable to relief through claims for equitable adjustment?

4. The record indicates that award of the RDA contract to AT&T was contested by a disappointed bidder who challenged AT&T's offer as a "buy-in." What factors were cited in support of this allegation? What was AT&T's response to this allegation?

5. At the time of award of the RDA contract, could satisfaction of the Navy's need for an undersea surveillance system have been achieved through the purchase of some other type of system? If so, at what cost?

6. How is the value of the benefit conferred on the Government by the RDA contract to be measured?

### CONCLUSION

For the reasons stated in this opinion, the court denies defendant's motion to dismiss for lack of jurisdiction and defendant's motion for summary judgment.[4] Also denied is plaintiff's cross-motion for partial summary judgment.

The issue left open by the court's opinion—whether plaintiff is entitled to recovery on a *quantum meruit* basis for the value of the benefits conferred upon the Government under the RDA contract—will require factual supplementation of the record either by stipulation of the parties or through trial.

---

4. Although plaintiff has not formally opposed that part of defendant's motion directed to Count II of the complaint (the mutual mistake allegation), we nevertheless deny that part also. We do so because factual inquiry is still open (in accordance with the present opinion); hence, plaintiff may adduce facts which, though offered in support of Count I, would also have legal significance in respect to Count II. Counts I and II are not so dissimilar in their legal elements as to rule out the possibility of overlapping facts in their proofs.