AMERICAN TELEPHONE AND TELE-GRAPH COMPANY and Lucent Technologies, Inc., Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 01–5044.

United States Court of Appeals, Federal Circuit.

Oct. 8, 2002.

C. Stanley Dees, McKenna & Cuneo, L.L.P., of Washington, DC, argued for plaintiffs-appellants. With him on the brief was Michael A. Hopkins. Of counsel on the brief was Thomas R. Suher, Lucent Technologies, Inc., of Greensboro, North Carolina. Of counsel was J. Keith Burt, McKenna & Cuneo.

Bryant G. Snee, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was Stuart E. Schif-

fer, Acting Assistant Attorney General. Of counsel on the brief was James H. Haag, Office of Counsel, Space and Naval Warfare Systems Command, Department of the Navy, of San Diego, California. Of counsel was Jeanne E. Davidson, Attorney, Department of Justice, of Washington, DC.

Before NEWMAN, RADER, and PROST Circuit Judges.

Opinion for the court filed by Circuit Judge RADER. Dissenting opinion filed by Circuit Judge PAULINE NEWMAN.

RADER, Circuit Judge.

The United States Court of Federal Claims dismissed the American Telephone & Telegraph Company's (AT & T) suit against the Navy for failure to state a claim. Because the Navy's violation of section 8118 of the Department of Defense (DoD) Act, Pub.L. No. 100–202, section 8118, 101 Stat. 1329, 1329–84 (1987), and alleged violation of various procurement regulations and directives was not a wrong actionable by AT & T, this court affirms.

## I.

The Court of Federal Claims has recently added another chapter to the lengthy story of this case. *Am. Tel. & Tel. Co. v. United States*, 48 Fed. Cl. 156 (2000) (*AT & T IV*). Already the history of this case involves three earlier decisions, including an en banc decision of this court. *Am. Tel. & Tel. Co. v. United States*, 32 Fed. Cl. 672 (1995) (AT & T I); *Am. Tel. & Tel. Co. v. United States*, 124 F.3d 1471 (Fed.Cir. 1997) (vacated and withdrawn) (*AT & T II*); and *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368 (Fed.Cir.1999) (en banc) (*AT & T III*). In addition, the certification of the interlocutory appeal from AT & T I is reported at 33 Fed. Cl. 540 (1995).

In *AT & T III,* this court held en banc that the Navy's violation of section 8118 did not void the Navy's contract with AT &

T. That opinion recites in detail the relevant facts of this case. For convenience, this court briefly restates the relevant background.

Section 8118 states:

*None of the funds* provided for the Department of Defense in this Act *may be obligated or expended for fixed price-type contracts* in excess of $10,000,000 for the development of a major system or subsystem *unless the Under Secretary of Defense for Acquisition determines, in writing, that program risk has been reduced* to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between the contracting parties: Provided, That the Under Secretary may not delegate this authority to any persons who hold a position in the Office of the Secretary of Defense below the level of Assistant Under Secretary of Defense: *Provided further, That the Under Secretary report to the Committees on Appropriations of the Senate and House of Representatives in writing, on a quarterly basis, the contracts which have obligated funds under such a fixed price-type developmental contract.*

*Id.* (emphases added).

During the 1980s, the Navy sought to develop detection technology for tracking ultra-quiet submarines of the Soviet Union. As part of an integrated sonar system, the Navy solicited bids for the reduced diameter array (RDA). AT & T bid for the RDA contract on a fixed-price basis against competitors that the Navy judged more technically competent. On December 31, 1987, the Navy awarded AT & T the RDA contract based on the substantially reduced price of its best and final offer (BAFO). In a bid protest, one of AT & T's competitors challenged that price as erroneous. *Gould, Inc., Ocean Sys. Div.,*

B–229965, 88–1 CPD ¶ 457 (May 16, 1988). AT & T retained the RDA contract in a vigorous bid defense. *Id.* AT & T eventually performed the RDA contract at a cost of over $91 million, greatly in excess of the contract's adjusted final price of about $34.5 million.

The Navy awarded the RDA contract to AT & T as a fixed-price contract just nine days after enactment of section 8118. Contrary to that section's provisions, the Navy awarded the RDA contract without the Under Secretary of Defense for Acquisition's written determination that RDA program risk had been reduced so that realistic pricing could occur.

This court held en banc that violation of section 8118 did not render the contract void *ab initio:*

> Both the DoD administration of § 8118, and the congressional response to this administration, make clear that Congress did not intend that this enactment would terminate fully performed contracts because of this flawed compliance.

*AT & T III,* 177 F.3d at 1375. Therefore, the en banc court remanded to the Court of Federal Claims to determine what remedy, if any, was available to AT & T for the Navy's violation of section 8118. In a well-reasoned opinion, the Court of Federal Claims held that "non-compliance with [section 8118] is not an actionable wrong.... [P]laintiffs cannot claim a protectable interest in the proper application of Section 8118 for Congress intended to give them none." *AT & T IV,* 48 Fed. Cl. at 160. The Court of Federal Claims also found that federal regulations and DoD directives did not remove the contracting officer's discretion to negotiate the RDA contract on a fixed-price basis. For these reasons, the Court of Federal Claims dismissed AT & T's complaint for failure to state a claim upon which relief could be granted. AT & T has sought reformation of its contract with the Navy. This court

has jurisdiction under 28 U.S.C. § 1295(a)(3) (2000).

## II.

■ This court reviews the Court of Federal Claims' conclusions of law, such as contract or statutory interpretation, without deference. *Mass. Bay Transp. Auth. v. United States,* 254 F.3d 1367, 1372 (Fed. Cir.2001). This court also reviews without deference the Court of Federal Claims' dismissal for failure to state a claim upon which relief can be granted. *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir.1998). This court sustains the Court of Federal Claims' fact finding unless "clearly erroneous." *City of El Centro v. United States,* 922 F.2d 816, 819 (Fed.Cir.1990).

### A.

■ This court must again consult the meaning of section 8118. *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 626, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978) ("[Courts] have no authority to substitute [their] views for those expressed by Congress in a duly enacted statute."). The language of section 8118 does not explicitly create a cause of action for enforcement of its expenditure prohibitions. Instead the only explicit provision with enforcement consequences in section 8118 requires quarterly reports to the "Committees on Appropriations of the Senate and the House of Representatives in writing." Thus, section 8118 envisions enforcement, if any, through legislative procedures. The language permits the appropriate legislative committees to monitor compliance and, presumably, guarantee enforcement in the form of future reductions in, or limitations on, appropriated funds. Indeed, appropriation bills often contain this kind of oversight provision that permits the appropriation committees to properly

monitor federal spending programs. Department of Defense Appropriations Act, 2000, Pub.L. No. 106–79, § 8075, 113 Stat. 1212, 1246–47 (1999) ("[T]he Secretary of Defense may issue loan guarantees in support of United States defense exports ... [p]rovided ... [t]hat the Secretary shall provide quarterly reports to the Committee on Appropriations."); Department of Defense Appropriations Act, 1999, Pub.L. No. 105–262, § 8075, 112 Stat. 2279, 2314 (1998); *see also* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, Pub.L. No. 105–276, § 414, 112 Stat. 2461, 2509 (1998) ("None of the funds ... shall be used to enter into any new lease ... unless the Secretary submits, in writing, a report to the Committee on Appropriations of the Congress."). Based on that oversight, the committees and Congress can then adjust the spending allotments in future bills to ensure compliance with legislative objectives. Thus section 8118 is an appropriations oversight provision that envisions enforcement, if any, in the form of legislative spending adjustments in future bills. Section 8118 does not make any provision for judicial enforcement.

As already noted, this court held en banc that section 8118 does not "terminate fully performed contracts because of [DoD's] flawed compliance." *AT & T III*, 177 F.3d at 1374–75. For that reason, the en banc court held that the Navy's "noncompliance with the supervisory and reporting instructions" in section 8118 did not render the RDA contract void. *Id.* at 1375 (citing *Longshore v. United States*, 77 F.3d 440, 443 (Fed.Cir.1996)). Instead, this court emphasized the "supervisory" role of the legislative branch in ensuring compliance with the policies of section 8118. More specifically, in *AT & T III*, this court held that section 8118 functions as an "internal review and reporting proce-

dure[ ]" for congressional oversight. *Id.* at 1376.

Indeed congressional response to DoD's flawed administration of section 8118 confirms this meaning of the statutory language. Following enactment of section 8118, Congress was apparently dissatisfied with DoD's initial compliance with that section. *Id.* at 1374. In response, subsequent legislation tightened that section's reporting provisions to require before-award reports rather than after-the-fact quarterly reports. *Id.* Again, before-award reports would permit Congress to respond with funding reductions or limitations in appropriations bills. In considering enactment of those stricter reporting provisions, the Senate Armed Services Committee stated expressly that noncompliance with section 8118 should not be "the basis for litigating the propriety of an otherwise valid contract":

> The committee recognizes that there are circumstances in which fixed-price development contracts are appropriate (e.g., when costs and foreseeable program risks can be reasonably anticipated), and the committee expects the Department to establish clear guidelines under this section for use of such contracts.

> It is the intent of the committee that this section be applied in a manner that best serves the government's interests in the long term health of the defense industry, and *that this section not be used as the basis for litigating the propriety of an otherwise valid contract.*

S.REP. No. 100–326, 100th Cong., 2d Sess. at 105 (1988) (emphasis added). This court en banc gave significant weight to this statement of one Senate committee. *AT & T III*, 177 F.3d at 1375 ("This explicit statement of intent weighs heavily against judicial invalidation of 'an other-

wise valid contract,' for the clearly stated congressional purpose is contrary.").

In sum, the language of section 8118 provides for legislative oversight and enforcement. The section does not create a cause of action inviting private parties to enforce the provision in courts. In that context, AT & T's suit for reformation presumes to undertake a challenge as a private party to the propriety of the otherwise valid RDA contract. AT & T's earlier attack on that contract's validity similarly presumed to undertake Congress's role as the enforcement mechanism for section 8118. Section 8118, however, does not permit this form of enforcement. As this court en banc refused to void the otherwise valid and performed RDA contract, so this court again acknowledges as correct the trial court's refusal to entertain AT & T's request for contract reformation. Section 8118 simply does not provide implicitly or explicitly for any enforcement of its supervisory and congressional oversight provisions in a judicial forum.

This result finds further support in separation of powers principles. As the en banc court noted, it is not "the judicial role to discipline the agency's noncompliance with the supervisory and reporting instructions of congressional oversight." *Id.* at 1375. The Supreme Court itself has acknowledged spheres of exclusive congressional oversight:

> "It is always easy to conjure up extreme and even oppressive possibilities in the exertion of authority. But courts are not charged with general guardianship against all potential mischief in the complicated tasks of government. The present case makes timely the reminder that 'legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.'

*Missouri, Kansas & Texas Ry. Co. v. May*, 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971. Congress which creates and sustains these agencies must be trusted to correct whatever defects experience may reveal."

*Federal Communications Comm'n v. Pottsville Broad. Co.*, 309 U.S. 134, 146, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

■ AT & T also alleges that the Navy violated a variety of procurement regulations and directives that guide a contracting officer's selection of contract type. *See, e.g.*, 48 C.F.R. §§ 16.104, 35.006, 216.101, 216.104 (1987); DoD Directive 5000.1 (Sept. 1, 1987). Those regulations and directives grant the contracting officer the discretion to select the type of contract. *See, e.g.*, 48 C.F.R. § 35.006(b) (Stating that "[s]electing the appropriate contract type is the responsibility of the contracting officer."); 48 C.F.R. § 16.103(a) ("Selecting the contract type is generally a matter for negotiation and requires the exercise of sound judgment."); 48 C.F.R. § 16.104 (Stating that "[t]here are many factors that the contracting officer should consider in selecting and negotiating the contract type ...."); *cf.* 10 U.S.C § 2306(a) (1982) (An agency head generally "may ... make any kind of contract that he considers will promote the best interests of the United States."). Moreover, in a negotiated procurement, as in this case, this court has held that the regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations. *LaBarge Prods. v. West*, 46 F.3d 1547, 1555 (Fed.Cir.1995); *see also Burroughs Corp. v. United States*, 617 F.2d 590, 597–98, 223 Ct.Cl. 53, 65 (1980).

In spite of contracting officers' generally broad discretion, AT & T argues that the procurement regulations and directives prohibited this contracting officer from negotiating the RDA contract on a fixed-price basis. Those provisions cautioned against a fixed-price contract where sub-

stantial developmental risk renders cost estimation merely hypothetical. *See, e.g.,* 48 C.F.R. § 216.104 (1987); 48 C.F.R. § 35.006(c) (1987). A caution, however, is not a prohibition. In fact, the regulations also admonished: "When the use of cost and performance incentives is desirable and practicable, fixed price incentive ... contracts should be considered." 48 C.F.R. § 35.006(c) (1987). In short, "selection of the appropriate contract type is, in the final analysis, the responsibility of the contracting officer," 48 C.F.R. § 216.104(1) (1987), subject to his good discretion.

■ Even if the contracting officer abused his discretion by negotiating the RDA contract on a fixed-price basis—a finding which the trial court properly declined to make on this record—that finding still would not provide AT & T a remedy. These cautionary and informative regulations and directives provide only internal governmental direction. Like section 8118, these provisions supply no remedy for private parties in a judicial forum. *Cf. Thompson v. Thompson,* 484 U.S. 174, 188–92, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring) ("[T]his Court has long since abandoned its hospitable attitude towards implied rights of action.... The recent history of our holdings is one of repeated rejection of claims of an implied right."). As this court's predecessor stated: "[T]he fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable. The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency ... [and not] by this court." *E. Walters & Co. v. United States,* 217 Ct.Cl. 254, 576 F.2d 362, 367 (1978).

AT & T presents also a variety of unsupported legal theories to support its claim. This court has considered those arguments and finds them entirely unpersuasive. In sum, this court holds that the district court did not err in holding that AT & T failed to state a valid claim under section 8118, the regulations and directives, or any other legal theory.

### B.

■ In view of the facts of this case, this court would be forced to conclude that AT & T waived its present arguments even were those arguments to state a valid claim. At the time it negotiated the RDA contract, AT & T was fifteenth among the Top 100 Federal Contractors, having 1,438 procurement actions worth over $2 billion. *AT & T III,* 177 F.3d at 1383 (PLAGER, J., dissenting). As a sophisticated player, AT & T bargained for and won a fixed-price contract—with all of its attendant benefits and risks. Despite AT & T's sophistication on these matters, the record simply provides no evidence that AT & T sought a cost reimbursement contract during contract negotiations.

As this court previously noted, AT & T successfully underbid technically superior competitors to win the RDA contract, and retained the contract with a vigorous defense against a competitor's protest action. Nonetheless, AT & T now argues that the courts must relieve it of the risk that it so aggressively pursued. It is too late now to make that claim.

The reformation that AT & T seeks is not minor, but strikes to the core of the contract bargain. In the fixed-price contract, for example, AT & T agreed, in essence, to assume the risk associated with its lower technical rating. Had the contract required cost-reimbursement, however, the Navy would have assumed the risk that AT & T's inferior technical capability would result in more costly performance. Under a cost-reimbursement scheme, this court perceives that the Navy may have refused to assume the risk of AT & T's

technical competency. Instead, the Navy might have avoided that risk by awarding the RDA contract to one of AT & T's technically superior competitors—a contingency of which AT & T surely was aware. In sum, competition on a cost-reimbursement basis may have taken AT & T out of the game. In any event, this court is not inclined to change the rules and the scoring after the game has been played.

Moreover, in a cost-reimbursement contract, the Government retains the right to minimize its risk by supervising closely the contractor's performance. By performing the RDA contract on a fixed-price basis, AT & T avoided the costs of more intrusive government supervision. These tradeoffs between Government oversight and contractor autonomy are fundamental to any agreement on price or contract type. Moreover, unlike money, these bargained for rights are not reallocable after performance. The FAR provides: "Negotiating the contract type and negotiating prices are closely related and should be considered together." 48 C.F.R. § 16.103(a) (1987). Contract reformation now, after full performance, would impose upon the Navy the full cost of performance at a time when the *quid pro quo* of a cost-reimbursement bargain, e.g., the right to supervise, is moot. Reformation here, simply put, would not further the mutual intent of the parties. See *Atlas Corp. v. United States*, 895 F.2d 745, 750–51 (Fed. Cir.1990) ("Reformation serves to bring the parties' written contract in accord with their agreement."); *Am. President Lines, Ltd. v. United States*, 821 F.2d 1571, 1582 (Fed.Cir.1987) ("The purpose and function of the reformation of a contract is to make it reflect the true agreement of the parties on which there was a meeting of the minds.").

Additionally, reformation of the RDA contract would cure the Navy's section 8118 noncompliance only at the expense of creating non-compliance with other statutory and regulatory provisions. Specifically, in 1987, 10 U.S.C. § 2306 essentially mirrored section 8118's certification requirements. Section 2306 expressly prohibited contracting officers from negotiating cost-reimbursement contracts without the agency head's certification that no lower cost alternative existed. 10 U.S.C. § 2306 (1982); *see also* FAR 16.301–3(c) (1987). As a result, reformation of the RDA contract to avoid noncompliance with section 8118 eliminates one hydra head only to raise another.

In short, the proper time for AT & T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. This, AT & T did not do. For reasons evident above, even were AT & T to have stated a valid claim for reformation, this court's case law would require a finding that AT & T waived that claim. *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443, 1446 (Fed.Cir.1997) ("The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [defense acquisition regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge.") (citing *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 738 (Fed.Cir.1997); *E. Walters & Co.*, 576 F.2d at 367–68).

## CONCLUSION

In sum, AT & T. does not have an enforceable interest in section 8118 or the asserted procurement regulations and directives. This court, therefore, affirms.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

This appeal is from the decision of the Court of Federal Claims, on remand from the Federal Circuit. This court had held that the fixed-price contract between AT & T and the Navy for development and production of the Surveillance Towed–Array Sensor System (a system for detecting previously undetectable submarines) was not void *ab initio* after complete performance, despite the Navy's admitted violation of Section 8118[1] of Pub.L. No. 100–202. *AT & T v. United States,* 177 F.3d 1368 (Fed.Cir.1999) (en banc). The Federal Circuit held that violation of Section 8118 was not a ground for retroactive annulment of the contract, explaining that:

> When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory; the courts have not, however, simply declared the contract void *ab initio.*

*Id.* at 1376 (citing cases). The court remanded to the Court of Federal Claims for consideration of the question of relief, on the premise that the contract was not void *ab initio.*

On remand the trial court did not consider the questions raised concerning the cost of performance of the contract. This highly advanced military system was successfully produced by AT & T, but at a cost several times the original estimate. AT & T said, and it was not disputed, that new technological problems cost millions of dollars to solve. Although no record was developed, my colleagues on this panel suggest that AT & T deliberately bid a cost that it knew was too low, and on this hypothesis my colleagues suggest that AT & T waived additional compensation. My colleagues stress that AT & T is a "sophisticated" contractor, apparently concluding that AT & T took the risk of a $50 million overrun and waived review of entitlement based on unforeseen technologic problems. None of these aspects was the subject of evidence or findings.

My colleagues further suggest that AT & T did not challenge the fixed-price form of contract, although it knew that the Navy was violating directives and regulations, in order to avoid governmental oversight during performance—a strange theory, also not the subject of evidence or findings. The proposition that a sophisticated contractor recognized the possibility of a $50 million loss but chose to take that loss in order to avoid scrutiny of its performance hardly accords with sophistication, or indeed with reality. I also take note of the finding by my colleagues that the AT & T technical capability was "inferior," a pejorative verdict on an issue outside the record; indeed, one must wonder if the Navy would select a technologically inferior candidate to develop so critical a defense.

None of these speculative theories was developed in the record; indeed, there was no evidence on any aspect of the project and its cost. The record before us shows only that the contractor completely and successfully performed a contact for which the technologic complexities, and the ensuing cost of technologic solutions, were seriously underestimated. As a fundamental

---

1. **Section 8118.** .... None of the funds provided for the Department of Defense in this Act may be obligated or expended for fixed price-type contracts in excess of $10,000,000 for the development of a major system or subsystem unless the Under Secretary of Defense for Acquisition determines, in writing, that program risk has been reduced to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between the contracting parties. Pub.L. No. 100–202 § 8118, 101 Stat. 1329–84 (1987).

premise of governmental procurement, it is presumed that the Navy believed that this submarine surveillance system could be developed and produced at the contract price. Indeed, if the Navy entered a contract that it knew could not be performed at the contract price, then the procurement was fatally tainted.

On remand the Court of Federal Claims simply dismissed the case, holding that since Section 8118 was not "enforceable" by AT & T, AT & T had no claim based on the admitted violation of Section 8118 by the government; the court declined to consider any other ground presented by AT & T, including "reformation, implied contract recovery, rescission and restitution," 48 Fed. Cl. at 161, and did not explain its conclusion that none of these grounds could apply. Instead, the Court of Federal Claims limited its consideration to the role of Section 8118, despite the Federal Circuit's remand to consider the issue of

relief. This panel also does not reach the issue of the remand. Instead, the panel majority simply restates and reexplains this court's prior ruling that violation of Section 8118 does not render a fully performed contract void *ab initio*.

The briefs raise factual and legal questions, and equitable aspects, the weight and value of which have never been aired, and on which evidence has never been adduced. I do not know whether this contract warrants relief. But it is incorrect to hold that the facts are irrelevant and that there can be no relief unless Section 8118 is enforceable by AT & T.[2] AT & T has not yet had its day in court. From my colleagues' affirmance of the dismissal of this action, I respectfully dissent.

2. I do not, of course, suggest that government procurement contracts are readily subject to change after performance. The law and precedent of contract and procurement require some grave error or mutual mistake or changed circumstance, such as would render it unconscionable for the government to re-

quire performance of the original terms. Government contracts differ from private contracts in that the government can always terminate a contract for "convenience," based on changed circumstances; the contractor, however, faces severe penalties for default if performance is discontinued.