**C.W. OVER & SONS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–741C.**

United States Court of Federal Claims.

Nov. 26, 2002.

Francis R. Laws, Thomas & Libowitz, P.A., Baltimore, MD, for plaintiff.

David B. Stinson, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Captain Bryan Downey, National Security Agency, of counsel.

## *OPINION*

MILLER, Judge.

This contract case is before the court after argument on cross-motions for summary judgment. After defendant obtained summary judgment on this claim, plaintiff succeeded in reopening proceedings, and the pending dispositive motions followed. Prompted by the Government's admission that the subject state tax for which the contractor seeks refund was not included in the Government-supplied price that the contractor utilized in its proposal, plaintiff seeks judgment in its favor. Defendant contends that the law affords no relief for the contractor's mistaken interpretation of the subject contract as exempt from state sales tax, so that the Government's admission does not afford plaintiff grounds for relief.

## FACTS

### 1. *Background*

The facts germane to this matter are recited in the court's previous opinions. *See C.W. Over & Sons, Inc. v. United States,* 44 Fed. Cl. 18 (1999) (*"Over I"*) (granting defendant's motion for summary judgment only on Count I that claimed reimbursement for sales tax costs); *C.W. Over & Sons, Inc. v. United States,* 45 Fed.Cl. 502 (1999) (*"Over II"*) (granting defendant's motion for summary judgment on Count III alleging that Government applied expired coefficients to certain delivery orders); *C.W. Over & Sons, Inc. v. United States,* 48 Fed.Cl. 342 (2000) (*"Over III"*) (denying defendant's motion for summary judgment on Count II concerning Government's alleged obligation to aggregate small work projects into one delivery order). Therefore, only the material facts involved in resolving the pending motions are discussed. The facts are drawn from the court's previous opinions and from the parties' proposed statements of fact, responses, and materials appended to the parties' motions. All facts are undisputed unless otherwise noted.

On May 20, 1993, the Maryland Procurement Office of the National Security Agency (the "NSA") issued a Request for Proposal (the "solicitation") for construction and repair work to be performed at Fort George G. Meade, Maryland. The solicitation indicated that the resultant contract would contain one base year and four one-year options. On January 14, 1994, the NSA awarded Contract No. MDA904–94–D–2502 to C.W. Over & Sons, Inc. ("plaintiff"). The contract was an indefinite delivery, indefinite quantity job order contract. The contracting officers were Robert M. DuCharme and Mark C. Doring. Mr. Doring drafted both the solicitation and the contract, with Mr. DuCharme reviewing and approving Mr. Doring's efforts.

Certain provisions of the contract directly impact the motions for summary judgment. First, section G.3 of the contract stated:

Certain transactions which occur pursuant to this contract, for example, the purchase of materials or supplies, may be exempt from the imposition of state or local taxes. It is the contractor's responsi-

bility to determine whether any transactions under the contract are exempt under the particular tax statute and to take advantage of any applicable exemptions. In addition, it may be useful for the contractor to inform the taxing authorities that the Maryland Procurement Office (MPO) is a federal government agency. In Maryland, it may be useful to inform Maryland taxing authorities that the MPO has been assigned Maryland State Tax Exemption Certificate Number 3000500 4.

Second, the contract incorporated by reference Federal Acquisition Regulation (FAR), 48 C.F.R. § 52.229–3 (2001), entitled "Federal, State, and Local Taxes." FAR § 52.229–3(b) provides: "The contract price includes all applicable Federal, State, and local taxes and duties." Third, the contract also incorporated by reference the *Job Order Contract Unit Price Book,* Vol. II (Aug. 19, 1991) (the "UPB"), "which is a project-segment based compilation of pre-priced work items and provides the costs for individual construction tasks." *Over I* at 20. Fourth, section B.2 of the contract clarified that the "unit prices [in the UPB] include all labor, material and equipment necessary to install one unit of a particular line item." The same section specifies that the contractor must formulate three fixed coefficients for the base year and for each of the four option periods. The three coefficients cover: 1) normal working hours, 2) other than normal working hours (overtime), and 3) flyaway services.[1] These coefficients "will be used to price the cost of each Delivery Order by multiplying the applicable coefficient by the unit prices and quantities. The coefficients must include all associated costs that are not included in the [UPB]." *Id.*

Before awarding the contract to plaintiff, the NSA gave potential offerors[2] a copy of a document entitled "Job Order Contract (JOC) Proposal Preparation Requirements," vol. II (Feb. 5, 1993) (the "PPR"). Although not incorporated into the contract, the document was provided in order to facilitate the award process. Page 7 of the PPR indicates that the "Government requires the contractor to provide a breakdown and explanation of all elements used to derive the contractor's coefficients." Among the "elements" to be included in the coefficients were "[t]ax laws (local, Federal, State, etc.)." *Id.* The PPR also noted that "[t]he Government will analyze this information [used to formulate the coefficients] to determine if the contractor has a sufficient understanding of the requirement." *Id.*

In its proposal to the NSA, plaintiff explained how it derived its coefficients. Plaintiff noted that the solicitation "indicates the use of Maryland State Tax Exemption Certificate number 3000500[sic] and therefore the coefficient does not contain any allowance for sales tax. Corporate taxes are estimated at 2.561%." The NSA issued several clarification questions in response to plaintiff's proposal, none of which questioned plaintiff's invocation of the exemption certificate or the exclusion of sales tax from its coefficients.

After the NSA awarded plaintiff the contract, plaintiff requested a tax exemption letter to provide to its material suppliers. On February 14, 1994, Mr. DuCharme denied the request "because the Tax Exemption clause is not applicable to the pre[-]priced line items. Any sales tax on materials is already included in the prices in the [UPB]."[3] Despite this denial, plaintiff continued to perform the contract, and the NSA ultimately exercised three of the four option years.

On February 20, 1998, plaintiff submitted a certified claim to Contracting Officer DuC-

---

**1.** As defined by clause B.2, a " 'coefficient' is a numerical factor that represents the contractor's direct and indirect costs and profit over and above the fixed prices established by the [UPB]." The submitted coefficients differed from year to year to reflect existing economic conditions, but would remain constant for the year that each was in effect.

**2.** Although plaintiff consistently uses the terms "bidders" and "bid" in describing the process culminating in the award of plaintiff's contract, these terms are not applicable to the contract. Defendant's characterization of the contract as a negotiated procurement is correct, and the nature of the contract affects the disposition of plaintiff's and defendant's respective motions. *See infra* Discussion, section 2.

**3.** It is undisputed that, when negotiating the cost of non-pre-priced items, plaintiff received a cost reimbursement for state sales tax.

harme, seeking, *inter alia,* "a contract adjustment in the amount of $797,994.97 for costs incurred as a result of the Government's failure to advise [plaintiff] of a mistake in its coefficient for sales tax . . . ." Plaintiff contended that the Government's reference in the solicitation to the tax exemption certificate "was extremely misleading" and that plaintiff took the reference "to mean that the contract was exempt from sales tax and consequently [plaintiff] did not include an allowance for sales tax in its coefficient." Because the Government "had ample opportunity" to review plaintiff's proposal, and because the proposal explained that the coefficient did not include sales tax, the "Government knew or had reason to know of [plaintiff's] mistake." Plaintiff claimed that "[o]nce on notice, the Government was required to advise [plaintiff] of its mistake and request verification . . ." of the submitted coefficients.

Mr. DuCharme responded to plaintiff's request by letter on July 20, 1998, denying plaintiff's claim in its entirety and stating that "the [UPB] price [for each line item] represents an installed price to include labor, materials, equipment, and sales tax." Pointing to the language in clause G.3 placing the onus of determining possible tax exemptions on the contractor, Mr. DuCharme took the position that "it was the contractor's obligation to determine if sales tax was applicable and was accommodated in the UPB or need [sic] to be covered in the coefficient." Because the sales tax was, in the Government's view, included in the UPB price, the two contracting officers did not expect offerors' coefficients to contain sales tax components. Thus, plaintiff's "alleged 'mistake' is at best a unilateral mistake on [plaintiff's] part which the Government was not on notice of. Contractor's [sic] are not entitled to equitable adjustment due to unilateral . . . assumptions, mistakes, or poor business judgments."

### 2. *Procedural history*

Because defendant, with new trial counsel, insisted that Count I was amenable to summary judgment, both parties have moved for summary judgment on Count I. The court previously granted summary judgment on Count I to defendant in *Over I,* but that opinion was premised on the Government's now superseded argument that the line item prices in the UPB included sales tax. A detailed discussion of the court's opinion in *Over I* is thus in order.

Plaintiff filed suit on September 23, 1998, under the Contracts Dispute Act, 41 U.S.C. § 609(a)(1)(2002). Count I of the complaint sought $797,994.97 as reimbursement for state sales tax incurred by plaintiff on materials purchased under the contract. Defendant moved for summary judgment on January 4, 1999, on all three counts of plaintiff's complaint. Both in its motion and during oral argument, defendant maintained that the line item prices in the UPB included state sales tax. Plaintiff countered that state sales tax was a factor to be included in the contractor's coefficient, because it was not a component of the UPB prices. In response to these positions, the court indicated during two conference calls held with the parties after oral argument that an investigation into "whether the UPB price listing included state sales tax . . . definitively could resolve any disagreements pertaining to Count I of the complaint." *Over I* at 24 n. 6. The court emphasized that any investigation would be voluntary, and defendant ultimately refused to pursue such an inquiry absent a directive from the court.

Thus, the court issued *Over I* on May 20, 1999, without the benefit of further exploration into the components of the UPB prices. The court relied heavily upon the affidavit of Mr. DuCharme appended to defendant's January 4, 1999 motion for summary judgment. Mr. DuCharme's affidavit represented that his "understanding of the UPB was that [a line item] represented a completely installed price." Aff. of Robert M. DuCharme, Dec. 15, 1998, ¶ 7. Accordingly, coefficients submitted by offerors "should not have included [sales] tax as a component," *id.* ¶ 6, because sales tax was included in the line item prices in the UPB. He claimed that the PPR and a United States Army manual on the job order contract process, "clearly limit[ ] the tax component [in the coefficient] to employee payroll taxes, insurance, and business or corpo-

rate taxes." *Id.* ¶ 6. Because both documents were given to potential offerors, he reasoned, the companies vying for the contract should have known that sales tax was built into the UPB line item prices. In support of this conclusion, Mr. DuCharme pointed to the facts that all three offerors on the contract "provided a breakdown of the elements they included in their respective coefficients" and that the only taxes included in these coefficients were "costs for insurance and/or payroll taxes . . . ." *Id.* ¶ 6.

In opposing defendant's summary judgment motion, plaintiff chided defendant for not submitting any evidence to prove that the UPB line item prices included sales tax. Plaintiff therefore contended that, but for the language of contract clause G.3 exempting the project from sales tax, it would have included sales tax in its coefficient. Plaintiff also argued that, in accordance with the PPR requirements, it submitted with its proposal a detailed listing of the components of its coefficients and included express language indicating that it understood the Maryland State Tax Exemption Certificate, mentioned in clause G.3, to exempt the entire project from state sales tax. Even though the PPR obligates the contracting officers to review the submitted coefficients to ensure conformity with the Government's requirements, plaintiff faulted the contracting officers for failing to notify plaintiff of its error regarding the tax status of the project. After the NSA refused to reimburse plaintiff for the sales tax costs it absorbed, plaintiff alleged that the NSA was in breach by not granting plaintiff the tax exemption it sought and by withholding a portion of the contract price.[4]

Alternatively, plaintiff argued that it was entitled to reformation of the contract under the theories of unilateral and mutual mistake.[5] Plaintiff pointed to two potential mistakes by the NSA: 1) a mistake as to the applicability of sales tax to the project, and/or 2) a mistake in determining that sales tax was a component of the UPB prices. Plaintiff admitted that it was mistaken in assuming that it was entitled to use the tax exemption certificate included in clause G.3. Thus, the alleged mutual mistake, according to plaintiff, was over "the inclusion of Maryland state sales tax in the coefficient." Pl.'s Br. filed Feb. 26, 1999, at 20. Plaintiff's unilateral mistake argument hinged on its assumption that its mistake was so apparent as to charge the Government with notice of it under 48 C.F.R. § 14.407–1 (2001).[6]

In the discussion in *Over I* addressing Count I of the complaint, the court rejected plaintiff's breach theory and its argument that the doctrines of mutual and unilateral mistake entitled plaintiff to reformation of the contract. Regarding its breach theory, the court concluded that plaintiff's interpretation of clause G.3 was unreasonable, because the clause "does not purport to suggest that the NSA is entirely tax exempt." *Over I* at 26. Moreover, clause B.2 of the contract, stating that "[t]he unit prices include all labor, material and equipment necessary to install one unit of a particular line item," provided no indication that the NSA's interpretation of the UPB prices was incorrect. *Id.* at 27. Thus, in contrast to plaintiff's contention that it could reasonably rely on the NSA's alleged assertion of tax exemption, the contract "places the burden on the contractor to determine which transactions, if any, are exempt . . . ." *Id.* at 26–27.

Plaintiff was also unable to prove that its error regarding the application of clause G.3 constituted a unilateral mistake, as it could not show that the error was compensable, or that "the contracting officer made a mistake or knew of [plaintiff's] alleged mistake . . ." in concluding the project was tax exempt.

---

4. Plaintiff argued that the contract price included the state sales tax at issue, as FAR § 52.229–3(b) defined the contract price as "all applicable Federal, State and local taxes and duties."

5. Plaintiff also invoked 48 C.F.R. § 14.407–4 (2001), as a basis for reformation, because that section governs mistakes discovered after the award of the contract. *See infra* Discussion, section 3.

6. FAR § 14.407–1 requires contracting officers to "examine all bids for mistakes. In the case of apparent mistakes and in cases where the contracting officer has reason to believe that a mistake may have been made, the contracting officer shall request from the bidder a verification of the bid, calling attention to the suspected mistake."

*Over I* at 30. Defendant argued that, because no other offeror included state sales tax in its coefficient, and "because the inclusion of sales tax within the UPB prices renders the exclusion of sales tax from the coefficient proper," it had no reason to know of plaintiff's belief that the entire contract was exempt from sales tax. Plaintiff did not present sufficient evidence to counter defendant's arguments.

Plaintiff was equally unsuccessful with its mutual mistake argument, as plaintiff was tasked with presenting sufficient evidence that the Government was mistaken over the tax status of the NSA, or in its belief that the UPB prices included sales tax. Plaintiff was unable to satisfy its burden. *See Over I* at 29 ("Plaintiff has not put forth any evidence that the NSA mistakenly believed that the agency was exempt from state sales tax. Nor has plaintiff offered evidence that the NSA was mistaken in its belief that the UPB already included sales tax.").

Finally, the court concluded that plaintiff's interpretation of clause G.3, the PPR, and FAR § 52.229–3(b) presented a patent ambiguity. Plaintiff interpreted clause G.3 as exempting the contract from sales tax; simultaneously, plaintiff believed that ¶ B(6) of the PPR required it to include sales tax in its coefficients. The court concluded that, when read in conjunction with language from FAR § 52.229–3(b) (stating that the contract price includes all applicable state taxes), the various clauses created a patent ambiguity. This patent ambiguity "must be construed against plaintiff for failing to discharge its duty to inquire" regarding the sales tax prior to submitting its proposal. *Over I* at 31. The court thus granted defendant's motion for summary judgment on Count I of the complaint.

The Government's insistence that the UPB line item prices included sales tax and plaintiff's inability to prove otherwise, colored the court's disposition of Count I. This litigation proceeded in the shadow of the Government's interpretation of the UPB. In order to appeal the court's decision as to Count I, plaintiff filed its Motion To Sever Claim, or, in the

Alternative, for Rule 54(b) Certification, on July 7, 1999. Although defendant responded to the motion on July 22, 1999, plaintiff did not file a reply. *See* Order entered Aug. 18, 1999. The court consequently denied plaintiff's motion on August 18, 1999. Plaintiff thereafter moved on July 7, 1999, for partial summary judgment with respect to Count III of the complaint, alleging that the NSA had applied expired coefficients to various delivery orders. Defendant cross-moved for summary judgment on Count III, and the court granted summary judgment for defendant on Count III on December 10, 1999. *See generally Over II.*

Plaintiff submitted its Motion for Reconsideration of the Court's Decision Granting Summary Judgment as to Count I after the court's decision in *Over II.* The Clerk's Office returned the motion unfiled on January 3, 2000, because it was unbound and submitted out of time. *See* RCFC 59(b) and 83.2(f), as then in effect. Plaintiff's corrected motion was filed on January 10, 2000. Plaintiff's motion essentially argued that defendant knew, when it filed its January 4, 1999 motion for summary judgment, that "sales tax was *not* included in the prices reflected in the UPB it currently employed." Pl.'s Br. filed Jan. 10, 2000, at 1. It based this allegation on deposition testimony taken from Messrs. DuCharme and Doring after the decision in *Over I.*

Unfortunately, plaintiff's motion was not recorded on the court's internal docket, and the matter was brought to the court's attention only on May 8, 2001. In the interim the court had denied defendant's motion for summary judgment as to Count II of the complaint, which alleged that the Government failed to bundle small job orders to meet a certain monetary threshold. *See generally Over III.* After ordering briefing on plaintiff's motion for reconsideration, the court noted that the "deposition testimony elicited manifestly should have been obtained before plaintiff responded to defendant's [original] motion for summary judgment." Order entered June 8, 2001, at 1–2.[7] Nevertheless, the court granted plaintiff's motion, "insofar

---

7. The court had faulted plaintiff for failing to seek leave to depose witnesses before responding

to defendant's first dispositive motion. *See Over I* at 28.

as plaintiff will be allowed at trial to prove its case on Count I." *Id.* at 2. However, the court also ruled that *Over I* "will stand as a ruling based on the record developed as of the date of issuance." *Id.* The parties subsequently filed the pending cross-motions for summary judgment.

The court finds itself in an unusual position. It is faced with many of the same arguments resolved in *Over I*, but now must address these issues in light of the Government's admission that its interpretation of the UPB was mistaken. The parties have stipulated that the line item prices contained in the UPB do not include sales tax.[8] Therefore, the court decides whether the revised interpretation of the UPB alters the disposition of Count I.

## DISCUSSION

### 1. *Summary judgment standards*

The standards applicable to plaintiff's and defendant's respective motions for summary judgment have not changed since *Over I*. Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Genuine disputes of material fact that may significantly affect the outcome of the matter preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Moreover, the summary judgment "standard mirrors the standard for a directed verdict ... which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250, 106 S.Ct. 2505.

Having cross-moved, each party bears the burden of demonstrating entitlement to judg-

ment, as well as the absence of issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the capacity of opposing each other's motion, plaintiff and defendant have the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. To create a genuine issue of fact, the party opposing summary judgment must do more than present some evidence on an issue it asserts is disputed: "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Accordingly, unsupported assertions or conclusory allegations are insufficient to withstand summary judgment. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985).

### 2. *Breach of contract*

Contract interpretation is a question of law and thus presents an appropriate question for resolution on summary judgment. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed.Cir.1996); *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n. 1 (Fed.Cir.1988).

Plaintiff argues that the NSA is in breach by refusing to compensate plaintiff for the state sales tax it paid in performing the contract. Plaintiff points to FAR § 52.229–3(b), which states that the contract price "includes all applicable Federal, State, and local taxes and duties." It also cites deposition testimony from Contracting Officer DuCharme, wherein he was asked whether the "contractor[,] as part of one of his entitlements under the contract[,] is entitled to all of the components of the contract price

---

8. The parties' Stipulation reads: "Other than the items covered by the small requirements work order process (clause H.28), the contractor was reimbursed for pre-priced items based upon the line item prices contained in the [UPB]. The contract formula for determining the price paid the contractor for pre-priced items was UPB [times] quantity [times] contractor's coefficient. The line item prices contained in the UPB do not include state sales tax." Pl.'s Proposed Finding of Fact No. 1, filed July 31, 2002.

which would include sales tax ...." Dep. of Robert M. DuCharme, Dec. 8, 1999, at 72. Mr. DuCharme responded, "Yes." *Id.* Plaintiff draws from this statement a shared intention that the NSA would reimburse plaintiff for its sales tax costs. Because plaintiff did not include state sales tax in its coefficient, and because the tax was not calculated into the UPB prices, plaintiff argues the NSA is withholding a component of the contract price to which it is entitled. This violation is made even more egregious, in plaintiff's eyes, in that it implicates FAR § 14.407–1, a provision requiring the contracting officer to notify an offeror if the officer suspects a mistake in the offeror's proposal.

Defendant counters that plaintiff has waived its right to claim breach, as it did not protest the governmental behavior that allegedly constituted the breach when plaintiff first learned of it. Defendant also argues that plaintiff essentially is seeking a change in contract terms; however, because plaintiff did not comply with the contract's Changes clause, plaintiff is barred from seeking an equitable adjustment to the contract price.

As a threshold matter, it is clear that FAR § 14.407–1 does not apply to this contract. Section 14.407–1 appears in part 14 of the FAR, which is directed only to sealed bidding. Part 15 of the FAR applies to negotiated procurements. Therefore, to determine the applicability of FAR § 14.407–1 to this contract, the court must determine whether the parties employed sealed bidding or negotiations during the contract award process. First, the court concluded in *Over I* that the "solicitation in this case was negotiated ...." *Over I* at 30. Plaintiff echoes this conclusion in its own brief. *See* Pl's Br. filed July 31, 2002 ("The solicitation in this case was negotiated"). Second, section 17 on the first page of the contract is entitled "CONTRACTOR'S NEGOTIATED AGREEMENT." Third, 48 C.F.R. § 6.401(a) (2001), catalogues the circumstances wherein contracting officers shall

solicit sealed bids. One of these situations is when it is "not necessary to conduct discussions with the responding offerors about their bids." FAR § 6.401(a)(3). As plaintiff has admitted, the NSA requested extensive clarification regarding plaintiff's proposal before plaintiff received the contract.

Plaintiff insists that, even if the contract was a negotiated procurement, *Griffy's Landscape Maintenance LLC v. United States,* 46 Fed.Cl. 257 (2000), stands for the proposition that the duties encapsulated in FAR § 14.407–1 apply to both sealed and negotiated contracts.[9] *Griffy's* involved a contractor that failed to include contact information for its insurer when it submitted a proposal for an Army contract. Even though the contractor had performed several previous contracts for the Army, the contracting officer did not inquire about the missing information and ultimately awarded the contract to another offeror.

The court determined that the omission of point of contact information was a "clerical mistake." 46 Fed.Cl. at 259. Finding that the duty of verification contained in FAR § 14.407–1 applied "regardless of whether the solicitation is characterized as negotiated or sealed," *id,* the court concluded that the duty to clarify "a clerical error applies as well in a negotiated procurement." *Id.* However, it appears that the court's holding may implicate clerical errors only, as it concluded that the "government's obligation is clear and simple. If it suspects a clerical error, it must ask." *Id.* at 261.[10]

Plaintiff cannot claim that its error as to the tax status of the project was clerical in nature. Plaintiff did not inadvertently omit relevant information from its proposal; rather, plaintiff made a determination that it could purchase the needed materials without incurring state sales tax and consequently did not submit the tax as part of its coefficient. *See Liebherr Crane Corp. v. United*

9. *Griffy's* quotes verbatim from and discusses FAR § 14.407–1, but mislabels the provision as "FAR § 14.406–1." 46 Fed.Cl. at 259.

10. Insofar as the holding in *Griffy's* is not limited to clerical errors, this court must respectfully disagree with its conclusions. As FAR § 14.407–1 appears in part 14 of the FAR, it applies only to sealed bidding. Since the contract at hand was the result of a negotiated procurement process, its administration is governed only by the provisions in part 15.

*States,* 810 F.2d 1153, 1157 (Fed.Cir.1987) (finding that no clerical or arithmetical error occurred when there was no difference between plaintiff's "intended bid and the bid [plaintiff] actually submitted").

The court agrees with defendant that plaintiff seeks essentially a change to the contract's terms and has not presented a viable breach claim. According to defendant, in "February 1998, [plaintiff] for the first time, notified the Government that it considered the Government's actions in February 1994 to constitute a change in the contract terms." Def.'s Br. filed Sept. 10, 2002, at 36. The "government actions" at issue appear to be the refusal of Mr. DuCharme to grant plaintiff a tax exemption letter from the NSA. In his February 15, 1994 letter denying plaintiff's tax exemption request, Mr. DuCharme made clear that "the Tax Exemption clause" (clause G.3) was not applicable to the pre-priced line items in the UPB, because the prices for these line items, in his opinion, already contained sales tax. Given that the sales tax was a component of the UPB prices, plaintiff "cannot charge an additional sales tax to the Government."

After performing the contract for four years, plaintiff submitted a certified claim to Mr. DuCharme on February 20, 1998. Plaintiff demanded, *inter alia,* $797,994.97 to cover the sales tax costs that it had absorbed under the contract. Plaintiff predicated its demand for this equitable adjustment on both the allegedly misleading information in clause G.3 regarding the project's tax status and the Government's failure to discover plaintiff's "mistake" regarding the components of the UPB prices.

Defendant argues that the four-year period between the denial of the tax exemption letter and plaintiff's certified claim letter supports a finding that plaintiff waived its right to claim an equitable adjustment. De-

fendant points to deposition testimony from Walter K. Wilson, plaintiff's project manager for the contract, indicating that plaintiff affirmatively chose to delay bringing a claim for the state sales tax from 1995 to "the end of the contract when all of [plaintiff's] harm has occurred." Dep. of Walter K. Wilson, May 24, 2002, at 66.[11]

During oral argument defendant also referred to *AT & T Co. v. United States,* 48 Fed.Cl. 156 (2000), *aff'd,* 307 F.3d 1374, 1381 (Fed.Cir.2002), in support of its waiver argument. Plaintiff in *AT & T* secured a contract from the United States Navy to develop sonar technology to track submarines dispatched by the Soviet Union. Plaintiff bid for the contract on a fixed-price basis against competitors that the Navy viewed as more technologically proficient. However, the Navy ultimately granted the contract to plaintiff based on the substantially reduced price presented in its best and final offer. While performing the contract, plaintiff incurred substantial overruns in its costs and eventually filed suit seeking reformation of the contract to a cost-reimbursement basis. Plaintiff based its reformation theory on the allegation that several procurement regulations and directives, and a section of the Department of Defense Act, prohibited granting the contract on a fixed-price basis.

In affirming the trial court's determination that plaintiff had failed to state a claim upon which relief could be granted, the Federal Circuit determined that "this court would be forced to conclude that [plaintiff] waived its present arguments even were those arguments to state a valid claim." 307 F.3d at 1380. Despite its institutional sophistication in the arena of government contracts, plaintiff had not attempted to negotiate a cost reimbursement contract. Indeed, it had "retained the contract with a vigorous defense against a competitor's [bid] protest action,"

---

11. Defendant also points to a July 7, 1995 memorandum entitled "Potential Claim Issues & Background, Current Contract." Although the document is not signed and contains no obvious indicia of authorship, it was prepared by a member of plaintiff's staff. It recites that when "we began work on this contract in February 1994," an attempt was made to gain tax relief from various suppliers. Since the suppliers demand-

ed a tax exemption certificate, "we approached Mr. . . . . DuCharme . . . to obtain such a copy." Mr. DuCharme did not grant the certificate, but the author of the memorandum states that "[a]t this point, I do not have a dollar value that could stand the scrutiny of an audit for the taxes we have paid which we feel we should be compensated for."

but "now argues that the courts must relieve it of the risk that it so aggressively pursued." *Id.* at 1380.

The Federal Circuit declined to do so, noting that if plaintiff had bid on a cost-reimbursement basis, the Navy might have granted another offeror the contract. To allow "[r]eformation here, simply put, would not further the mutual intent of the parties," because the Navy did not agree to reimburse plaintiff for its costs when the contract was executed. *Id.* at 1381. "In short, the proper time for [plaintiff] to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. [Plaintiff] did not do so .... [Therefore], even were [plaintiff] to have stated a valid claim for reformation, this court's case law would require a finding that [plaintiff] waived that claim." *Id.* at 1381.

Thus, the Federal Circuit ruled that, when a contractor makes a decision during the contract award process that later causes it harm, reformation is not available if the contractor could have rectified the situation during that process. In the case at bar, plaintiff seeks reimbursement for the sales tax costs it incurred while performing the contract. Plaintiff's proposal stated that it was not including state sales tax in its coefficient. That its decision to exclude state sales tax was the result of its erroneous understanding of clause G.3 does not distinguish plaintiff's situation from *AT & T*'s rationale. The parties agreed to a contract whereby state sales tax was excluded, and plaintiff, four years after receiving the contract, brought forth its claim for reimbursement of its sales tax costs. In these circumstances plaintiff has waived the right to raise that claim.[12]

The court therefore finds and concludes that plaintiff is not entitled to recover under its breach theory.

### 3. *Reformation*

Plaintiff also seeks relief through reformation, arguing that the doctrines of both unilateral and mutual mistake apply. 48 C.F.R. § 15.508 (2001), is proffered as an alternative

basis for reformation. Defendant resists affording relief under any of these theories and advances the additional defense of patent ambiguity.

In *Over I* the court placed significant reliance on the affidavit submitted by Contracting Officer DuCharme, as the Government had not yet abandoned its incorrect interpretation of the constituents of the UPB prices. Mr. DuCharme emphatically stated that it was his belief that the UPB prices included a sales tax element, and plaintiff did not "offer[ ] evidence that NSA was mistaken in its belief that the UPB already included sales tax." *Over I* at 29. Consequently, the court concluded that plaintiff's decision not to include sales tax in its coefficient was a mistake in judgment and that reformation could not be predicated on such a mistake.

Now that the Government has abandoned the interpretation of the UPB that fueled the result in *Over I*, the court must re-examine whether plaintiff is entitled to reformation under any of its theories.

#### 1) *Unilateral mistake*

■ To be entitled to reformation under unilateral mistake, the contractor must show that "the contracting officer knew or should have known of the contractor's unilateral mistake at the time the bid was accepted." *Bromley Contracting Co. v. United States,* 794 F.2d 669, 672 (Fed.Cir.1986). Moreover, the mistaken proposal must contain a "clear cut clerical or arithmetical error, or misreading of the specifications." *Id.* (internal citations omitted). While the complete "omission of a cost item from the bid calculation may be such a mistake, ... no contractor can recover for an error in judgment." *Id.*

■ Plaintiff's alleged unilateral mistake was its misinterpretation of clause G.3. Plaintiff interpreted the clause as exempting the entire NSA contract from state sales tax, so plaintiff excluded this tax from its coefficient. Plaintiff postulates that the two contracting officers should have known of plaintiff's er-

---

12. The court also notes that defendant's mistaken interpretation of the UPB prices did not cause or

implicate plaintiff's misreading of clause G.3.

ror, as they are charged with reviewing proposals to ensure that offerors' coefficients are calculated correctly. Page 7 of the PPR, although not expressly incorporated into the contract, informed potential offerors that the "Government requires the contractor to provide a breakdown and explanation of all elements used to derive the contractor's coefficients .... The Government will analyze this information to determine if the contractor has a sufficient understanding of the requirement." This provision placed the onus for determining the accuracy of the coefficients on the contracting officer, but the Government's inaccurate characterization of the UPB prices, according to plaintiff, prevented the contracting officer from adequately fulfilling this duty. Because the contracting officers incorrectly believed that state sales tax was included in the UPB prices, they presumptively were unaware that the tax should be accounted for in the submitted coefficients.

Defendant responds that, even if the Government had been operating under the belief that sales tax should be included in the coefficient, the contracting officers would have had no reason to know of plaintiff's mistake regarding the meaning of clause G.3. The court concludes that defendant is correct. Paragraph 6 of plaintiff's proposal states: "The bid package indicates the use of Maryland Tax Exemption Certificate number 3000500[sic] and therefore the coefficient does not contain any allowance for sales tax. Corporate taxes are estimated at 2.561%." In *Over I*, the court determined that the interaction of clause G.3 and FAR § 52.229–3(b) "places the burden on the contractor to determine which transactions, if any, are exempt, and to include all applicable taxes in the contract price." *Over I* at 26–27. The Government's revised interpretation of the UPB has no impact on this ruling. Therefore, even if operating under the correct interpretation of the UPB prices, plaintiff's "price proposal gave no indication that plaintiff did not, in fact, make the required determination." Def.'s Br. filed Sept. 10, 2002, at 24. The contracting officers charged with reviewing plaintiff's proposal reasonably could interpret the language from ¶ 6 as indicating that plaintiff had performed the

necessary research and concluded that the entirety of the contract was exempt from sales tax.

However, even if the contracting officers should have known of plaintiff's mistake regarding clause G.3, plaintiff still must show that its error is compensable. To prove that it is entitled to recover, plaintiff must overcome the conclusion in *Over I* that its mistake was one of judgment. *See Over I*, at 29; *Ruggiero v. United States*, 190 Ct.Cl. 327, 335, 420 F.2d 709, 713 (1970) (stating that recovery for mistake cannot be premised on mistake in judgment). Plaintiff attempts to do so through *Liebherr Crane*, 810 F.2d at 1157, which states that an offeror's misreading of a specification may qualify as a compensable mistake. Plaintiff contends that it "clearly misread the specifications of the bid proposal, opting not to include state sales tax in its coefficient calculation." Pl.'s Br. filed July 31, 2002, at 20. The allegedly misread "specification" was clause G.3.

Defendant rejoins that plaintiff made a mistake in judgment, not of fact, and that plaintiff was mistaken as to the meaning of a contract clause, not of a specification. Even if clause G.3 qualifies as a specification, it is unambiguous on its face and not susceptible to a misreading. Moreover, the fact that plaintiff was awarded a prior contract with a clause identical to G.3 means it was "well acquainted with this contract term." Def.'s Br. filed Sept. 10, 2002, at 26.

Closer analysis of *Liebherr Crane* betrays the extent to which plaintiff's argument stretches the meaning of "specification." *Liebherr Crane* involved a Navy request for proposals for the construction of portal cranes. The request "included a 98–page technical specification which set forth detailed design requirements." 810 F.2d at 1154. Plaintiff's president, engaging only in a cursory perusal of three or four pages of the specification, overlooked "special sections of substance which pertained to industry and military specification standards." *Id.* Consequently, plaintiff's president did not realize that the effect of the specification was to require cranes weighing over 700 tons each. The president instead submitted a proposal

based on a much lighter crane; not surprisingly, plaintiff's proposal was dramatically lower than any other.

The specification at issue in *Liebherr Crane* included specific design standards for the type of crane requested by the Navy. As defined in *Black's Law Dictionary* 1399 (6th ed.1990), a "specification," when "used in the law relating to patents, manufacturing, and construction contracts, [is] a particular or detailed statement, account or listing of the various elements, materials, dimensions, etc. involved." In the case at bar, clause G.3 states: "It is the contractor's responsibility to determine whether any transactions under the contract are exempt under the particular tax statute and to take advantage of any applicable exemptions." Such language cannot be properly described as a specification. Instead, even when viewed in light of the Government's revised interpretation of the UPB prices, plaintiff made a mistake of judgment when interpreting the clause. According to the plain language of the clause, the responsibility was solely plaintiff's to determine the tax status of any aspect of the contract. The NSA's evolving theory of the components of the UPB prices does not impact whether a particular transaction is tax exempt or not.

Ultimately, the new light in which the court must view plaintiff's unilateral mistake theory does not aid plaintiff. Even though the PPR charged the Government with assessing the accuracy of plaintiff's proposal, plaintiff still made a mistake in judgment when assuming that clause G.3 indicated that the entire project was exempt from sales tax. *See Sanders–Midwest, Inc. v. United States*, 15 Cl.Ct. 345, 352 (1988) (finding that plaintiff's erroneous conclusion that its contract was exempt from Arizona state sales tax constituted mistake in judgment, because contract unambiguously did not represent whether state had applicable sales tax).

The court thus finds that plaintiff's error is not compensable under the doctrine of unilateral mistake and concludes that plaintiff is not entitled to reformation under this theory.

---

**13.** Plaintiff also characterizes the parties' "respective mistakes" as relating "to an existing fact: '[T]he contract price include[d] all applica-

*2) Mutual mistake*

█ In order to satisfy a claim for mutual mistake, the party advocating reformation must prove four elements: 1) the parties to the contract were mistaken in their belief regarding a fact; 2) that mistaken belief constituted a basic assumption underlying the contract; 3) the mistake had a material effect on the bargain; and 4) the contract did not put the risk of the mistake on the party seeking reformation. *See Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed.Cir.1994) (citing *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed.Cir.1990), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990)).

█ As to the first element, plaintiff argues that "both the Government and [plaintiff] were mistaken about the terms for compensating the contractor for state sales tax when this contract was awarded." Pl.'s Br. filed July 31, 2002, at 11.[13] According to plaintiff, the NSA believed that plaintiff was compensated for state sales tax because it was included in the UPB price; on the other hand, plaintiff believed that the materials necessary for contract performance were exempt from state sales tax because of the language in clause G.3.

Defendant once again declaims that the parties were not mistaken as to a "fact." Def.'s Br. filed Sept. 10, 2002, at 8. Instead, plaintiff's mistake "concerned proper application of contract clause G.3," so plaintiff committed a mistake in judgment. *Id.* Defendant also invokes this court's ruling in *Over I* that plaintiff's interpretation of clause G.3 was unreasonable and that plaintiff had a duty to inquire as to its meaning. The heart of defendant's argument, however, is that the NSA's mistake concerning the UPB price was not shared by plaintiff; therefore, the parties were mistaken as to separate components of the contract. Defendant grounds this conclusion in *Bromley*, 794 F.2d 669, which it claims is "dispositive" on the issue of mutual mistake. Def.'s Br. filed Sept. 10,

ble Federal, State, and local taxes and duties.'" Pl.'s Br. filed July 31, 2002, at 15 (quoting FAR § 52.229–3(b)).

2002, at 9. Both parties have dissected *Bromley* to compliment their respective positions.

*Bromley* involved a contract to replace the roof on a federal office building. In 1978 the General Services Administration ("GSA") hired a consulting firm to estimate the cost to repair the roof; after obtaining and revising the estimation, GSA advertised for bids, and eventually received proposals for the project from plaintiff and another contractor. Plaintiff was awarded the contract, and three days after the deadline for completion, plaintiff gave notice that it had neglected to include labor costs in its bid. Although plaintiff made two requests for an equitable adjustment, the contracting officer refused to reform the contract. Plaintiff appealed to the Federal Circuit after a board of contract appeals affirmed the denial.

Plaintiff argued that it was entitled to reformation under mutual mistake and unilateral mistake. Regarding mutual mistake, plaintiff contended that the Government's price estimate, and its own bid, were calculated incorrectly. The Federal Circuit, however, affirmed the board's finding that the parties "did not enter into the contract based on commonly mistaken beliefs." 794 F.2d at 671. Instead, plaintiff omitted labor costs from its bid, while defendant underestimated the cost of several items involved in the roof repair. "While [plaintiff's] bid and [the Government's] estimate were both mistaken as to the total cost of completing the job ... these separate errors do not constitute a mutual mistake that would allow contract reformation." *Id.*

Defendant argues that the *Bromley* court's conclusion should be applied here, as it construes its mistake regarding the UPB prices, and plaintiff's mistake regarding the potential exemption of the project from state sales tax, as "separate errors." Def.'s Br. filed Sept. 10, 2002, at 10. While defendant is correct that both the NSA and plaintiff were mistaken as to separate provisions of the contract, this case presents a much closer question than did the facts in *Bromley.*

After careful consideration the court must reject plaintiff's position, as plaintiff is sponsoring the same generalized argument rejected in *Bromley.* Plaintiff's mistake concerned the tax exemption status of materials used in the project, and defendant's mistake concerned the inclusion of state sales tax in the UPB. Plaintiff attempts to harmonize these mistakes into one "mutual mistake" by arguing that both parties "were mistaken about the terms for compensating the contractor for state sales tax when this contract was awarded." Pl.'s Br. filed July 31, 2002, at 11. Indeed, at oral argument, plaintiff agreed that it was advocating the intriguing formulation that "both parties were mistaken about the same item, to wit, the includability of sales tax in the coefficient." *See* Transcript of Proceedings, *C.W. Over & Sons, Inc. v. United States,* No. 98–741C, at 67 (Fed.Cl. Oct. 24, 2002).

*Bromley* forecloses every iteration of plaintiff's mutual mistake argument. The *Bromley* court noted that plaintiff's exclusion of labor costs from its proposal and the Government's underestimates as to the cost of the project were mistakes "as to the total cost of completing the job." 794 F.2d at 671. However, this remote similarity did not disguise the fact that the parties had engaged in "separate errors [that] do not constitute a mutual mistake that would allow contract reformation." *Id.*

Because plaintiff cannot satisfy the first element of mutual mistake, it is not entitled to reformation under this theory. However, the court notes that plaintiff may not satisfy any of the remaining aspects of mutual mistake. The second element of the doctrine requires that the mistaken belief constitute a basic assumption underlying the contract, and the third element requires that the mistake have a material effect on the bargain. Plaintiff presents no evidence on either of these elements; instead, it merely makes the conclusory statement that "the inclusion of Maryland state sales tax was a basic assumption underlying this aspect of the contract that had a material effect on the bargain." Pl.'s Br. filed July 31, 2002, at 15.

As to the fourth element of mutual mistake, each party claims that the risk of mistake lay with the other. However, plaintiff's argument centers on its belief that FAR § 14.407–1 "indisputably puts the burden on

the Government to examine the contractor's bid to elucidate the components of its coefficient for the Government's review to make sure the contractor accurately interpreted the solicitation and included the necessary components of the coefficient." Pl.'s Br. filed July 31, 2002, at 16. As the court has determined that FAR § 14.407–1 does not apply to this contract, it cannot credit this argument. Defendant also can rely on the language in clause G.3, stating that it is the contractor's responsibility to determine any tax exemptions and to the determination in *Over I* that the patent ambiguity in plaintiff's interpretation of two contract clauses created a duty to seek clarification.

Despite its rejection of plaintiff's argument premised on mutual mistake, the court, as a final matter, must address plaintiff's invocation of *Southwest Welding & Mfg. Co. v. United States,* 179 Ct.Cl. 39, 373 F.2d 982 (1967). *Southwest Welding* involved plaintiff's contract with the Army Corps of Engineers to supply labor and materials for constructing and installing various additions to a North Dakota dam. The contract provided for payment based upon a cost calculation of $7.53 per 100 pounds of steel. When the contract was drafted, both parties believed that this figure reflected plaintiff's steel procurement costs; however, plaintiff discovered a few days after executing the contract that its procurement costs would be higher. Accordingly, the "agreement, as written, conferred benefits upon the Government which neither party desired or intended." 179 Ct. Cl. at 52, 373 F.2d at 990. The Court of Claims concluded that both parties intended that plaintiff be compensated based on its actual costs and that the $7.53 figure did not accurately reflect this intention. The contract thus was reformed to reflect plaintiff's actual costs.

The Federal Circuit affirmed the viability of *Southwest Welding* in *Bowen–McLaughlin–York Co. v. United States,* 813 F.2d 1221 (Fed.Cir.1987). In *Bowen* the court stated that the *Southwest Welding* court "founded its ruling on the underlying fact that both the Government and the contractor intended that the latter be compensated on the basis of its actual costs." 813 F.2d at 1222. In such a

scenario, reformation was proper to reflect the shared intention of the parties.

Plaintiff cannot analogize the situation at hand to that of the parties in *Southwest Welding.* Clause G.3 placed the burden of determining tax exemptions on plaintiff. The Government manifested no intention to compensate plaintiff fully for tax costs that plaintiff voluntarily excluded from its coefficients. Therefore, plaintiff cannot claim that the contract does not reflect the parties' true intentions regarding plaintiff's tax costs. *See AT & T,* 307 F.3d at 1381 (refusing to grant reformation when to do so would not further mutual intent of parties).

Plaintiff has not proved that it is entitled to reformation under the doctrine of mutual mistake.

### 3) *FAR § 15.508*

In a final attempt to support reformation, plaintiff argues that FAR § 15.508 entitles it to an adjustment to the contract price. Plaintiff points to the determination in *Over I* that the "solicitation in this case was negotiated and thus falls properly under FAR § 15.508." *Over I* at 30. Section 15.508 provides that "[m]istakes in a contractor's proposal that are disclosed after award shall be processed substantially in accordance with the procedures for mistakes in bids at 14.407–4." Section 14.407–4(c) mandates that a contractor must demonstrate by clear and convincing evidence that the "mistake was (1) mutual, or (2) if unilaterally made by the contractor, so apparent as to have charged the contracting officer with notice of the probability of the mistake." If such a mistake occurred, then the contract price may be increased only if the corrected price "does not exceed that of the next lowest acceptable bid under the original invitation for bids." FAR § 14.407–4(b)(2)(ii). Plaintiff contends that it can satisfy all of FAR § 14.407–4's requirements and that its proposal, even with the approximately $800,000.00 adjustment for the sales tax costs, still would have been the lowest submitted to the NSA.

Defendant dismisses plaintiff's assertion that its proposal would have remained the lowest submitted as based on "gossip." Def.'s Br. filed Sept. 10, 2002, at 27. Plaintiff

grounds its theory on the deposition testimony of Charles W. Over, plaintiff's president, who believes plaintiff's proposal would have remained low based on "talk through the grapevine," and conversations with "work people." Dep. of Charles W. Over, May 10, 2002, at 66–67.

As addressed above, plaintiff has not satisfied the elements of either unilateral or mutual mistake. Even if plaintiff had presented sufficient evidence for the court to invoke unilateral and/or mutual mistake, Mr. Over's testimony does not provide a sufficient basis upon which to predicate a grant of summary judgment for plaintiff on this issue. Mr. Over's statements merely reflect his belief that plaintiff's offer would have remained the lowest even with the close to $800,000.00 adjustment for the sales tax. Nor does plaintiff raise a genuine issue of material fact as to whether Mr. Over's belief was warranted.

The court thus finds that plaintiff has not put forth sufficient evidence to entitle it to reformation under FAR § 15.508.

### 4. *Patent ambiguity*

■ As a defense to plaintiff's claims, defendant points to the court's determination in *Over I* that plaintiff's interpretation of clause G.3, the PPR, and FAR § 52.229–3 created a patent ambiguity such that plaintiff had a duty to inquire regarding sales tax prior to submitting its proposal. *Over I* at 30. Because plaintiff failed to satisfy this duty, the court was required to construe the contract language against plaintiff. Defendant now argues that discovery subsequent to *Over I* has not provided any basis upon which to overturn the ruling that "plaintiff assumed the risk for any unanticipated costs incurred if its understanding [of clause G.3] proved to be erroneous." Def.'s Br. filed Sept. 10, 2002, at 32.

Defendant is correct that clause G.3, the PPR and FAR § 52.229–3, even in light of the Government's new interpretation of the UPB, created a patent ambiguity. *Over I* concluded that clause G.3 indicated that certain aspects of the contract might be exempt from sales tax, but it was the contractor's responsibility to determine what, if any, exemptions applied. Plaintiff, however, construed G.3 as exempting the entire project from sales tax. Plaintiff then interpreted ¶ B(6) of the PPR, "Tax laws (local, Federal, State, etc.)," to mean that the contractor should include sales tax in its coefficients. When clause G.3 and the PPR were read in conjunction with FAR § 52.229–3(b), a patent ambiguity was present. *See Over I* at 30. Consequently, plaintiff was under a duty to inquire "regarding the function of sales tax within the context of the contract." *Id.*

During oral argument plaintiff asserted that the Government's new position on the UPB prices necessitated a re-examination of plaintiff's interpretation of clause G.3. Whereas plaintiff's interpretation of that clause in *Over I* was at odds with FAR § 52.229–3(b), plaintiff now claims that G.3 implicates only where and how plaintiff was to account for the sales tax. Under plaintiff's new theory, because the contract price includes sales tax, plaintiff's decision whether to take advantage of the potential tax exemptions described by clause G.3 would not affect its ability to be reimbursed for sales tax. Thus, plaintiff's reading of G.3 is not at odds with either FAR § 52.229–3(b) or the PPR, as neither disqualifies plaintiff from receiving its sales tax costs.

The court cannot credit plaintiff's revised interpretation of G.3. Even if the correct interpretation of the UPB were known when plaintiff was formulating its proposal, plaintiff has presented no evidence that this interpretation would have altered its conclusion that the entire project was tax exempt. Plaintiff made a judgment call that the entire project was tax exempt. Thus, plaintiff still would have been faced with the same patent ambiguity found in *Over I* and still would have been charged with a duty to inquire regarding the sales tax issue.

The court concludes that, even if plaintiff had provided a basis for reformation, the patent ambiguity doctrine would preclude recovery.

### CONCLUSION

It is not common that a contracting officer's mistake—especially one as striking as

that committed here—has no impact on liability. Nonetheless, after considering plaintiff's claims in light of the Government's revised interpretation of the UPB prices, the court must conclude that plaintiff is not entitled to recovery under a breach theory or under any of its reformation theories. Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's Cross–Motion for Summary Judgment Upon Count I is granted.

2. Plaintiff's Motion for Summary Judgment Upon Count I is denied.

3. The parties shall proceed in accordance with the June 11, 2002 scheduling order.